UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GOVERNMENT OF BERMUDA,<br><br>                    Plaintiff,<br><br>      v.<br><br>LAHEY CLINIC, INC. (a.k.a. LAHEY<br>HOSPITAL & MEDICAL CENTER,<br>BURLINGTON), and<br>LAHEY CLINIC HOSPITAL, INC.,<br><br>                    Defendants. | C.A. No. |

## **COMPLAINT**

Luke T. Cadigan (BBO #561117)
Robert B. Lovett (BBO #561691)
Michael J. McMahon (BBO # 679053)
Elizabeth A. Trafton (BBO #693969)
COOLEY LLP
500 Boylston Street
Boston, MA  02116-3736
Tel.:  (617) 937-2300
Fax:   (617) 937-2400
lcadigan@cooley.com
rlovett@cooley.com
mmcmahon@cooley.com
etrafton@cooley.com

*Counsel for Plaintiff Government of
Bermuda*

# TABLE OF CONTENTS

**Page**

NATURE OF THE CASE ............................................................................................ 1

PARTIES ................................................................................................................... 3

NON-PARTY CO-CONSPIRATORS........................................................................ 3

JURISDICTION AND VENUE ................................................................................. 5

FACTUAL ALLEGATIONS ..................................................................................... 5

    I.      Brown's Rise to Power in Bermuda.......................................................... 5

    II.     For Nearly Two Decades, Lahey and Brown Conspired to Promote
          Lahey's Interests in Bermuda in a Scheme Fueled by Lahey's Payment to
          Brown of Bribes Disguised as Consulting Fees.................................... 8

          A.     Lahey Actively Exploited Brown's Role as Premier to Further Its
                 Interests in Bermuda ............................................................. 14

          B.     Lahey's Relationship with Brown Has Made It the Leading
                 Foreign Provider of Healthcare Services On and Off the Island
                 Today ...................................................................................... 18

    III.    Lahey, Brown, and the Brown Clinics Further Their Fraudulent Scheme
          and Generate Huge Returns Through the Use of Medically Unnecessary
          Diagnostic Imaging............................................................................. 19

          A.     Brown Actively Pressured Public Officials to Increase Rates and
                 Induced Physicians to Increase Referrals for Diagnostic Testing ........... 24

          B.     MRI and CT Use Skyrockets in Bermuda and at the Brown Clinics....... 26

          C.     Physiological and Psychological Risks of Overscanning ...................... 27

    IV.    Lahey, Brown, and the Brown Clinics Profit Wildly from Their
          Collaboration........................................................................................ 28

    V.     Lahey and Brown Transacted Business in and from Massachusetts ................. 28

    VI.    Defendants' Fraudulent Concealment of the Schemes Tolls Any
          Applicable Statute of Limitations ....................................................... 30

    VII.   Defendants' Pattern of Racketeering Activity Caused Injury to Plaintiff's
          Business and Property.......................................................................... 31

    VIII.  Use of the Mails and Wires in Furtherance of Unlawful Scheme ...................... 33

    IX.    Use of Foreign Travel to Promote Unlawful Activity ......................................... 34

COUNT I RICO SECTION 1962(a) (BOTH DEFENDANTS).................................. 35

# TABLE OF CONTENTS
## (continued)

Page

1. Lahey and/or Lahey, Brown, and the Brown Clinics Constitute an Enterprise Engaged in Foreign Commerce ........................................................... 35

2. The Enterprise Used and Invested Income Derived from a Pattern of Racketeering Activity ................................................................................................ 35

    a. Mail and Wire Fraud ................................................................... 36

    b. Travel Act ...................................................................................... 36

    c. G.L. c.271 § 39 ............................................................................. 36

    d. Foreign Corrupt Practices Act .................................................. 37

    e. Money Laundering ....................................................................... 37

3. Defendants' Racketeering Activity Formed a Pattern ......................... 37

4. Defendants' Racketeering Activity and Violations of 18 U.S.C. § 1962(A) Directly and Proximately Caused Plaintiff's Injury ............................ 38

COUNT II RICO SECTION 1962(b) (BOTH DEFENDANTS) ................................ 38

1. Lahey and/or Lahey, Brown, and the Brown Clinics Constitute an Enterprise Engaged in Foreign Commerce ........................................................... 38

2. Lahey Acquired and Maintained Interests in and Control of the Enterprise ....... 39

    a. Mail and Wire Fraud ................................................................... 39

    b. Travel Act ...................................................................................... 39

    c. G.L. c.271 § 39 ............................................................................. 40

    d. Foreign Corrupt Practices Act .................................................. 40

    e. Money Laundering ....................................................................... 40

3. Defendants' Racketeering Activity Formed a Pattern ......................... 41

4. Defendants' Racketeering Activity and Violations of 18 U.S.C. § 1962(b) Directly and Proximately Caused Plaintiff's Injury ............................ 41

COUNT III RICO SECTION 1962(c) (BOTH DEFENDANTS) .............................. 41

1. Lahey and/or Lahey, Brown, and the Brown Clinics Constitute an Enterprise Engaged in Foreign Commerce ........................................................... 42

2. Defendants Conducted and Participated in the Enterprise Through a Pattern of Racketeering Activity .................................................................................. 42

    a. Mail and Wire Fraud ................................................................... 43

    b. Travel Act ...................................................................................... 43

# TABLE OF CONTENTS
## (continued)

**Page**

    c.    G.L. c.271 § 39 ................................................................................ 43

    d.    Foreign Corrupt Practices Act ................................................. 43

    e.    Money Laundering.................................................................... 44

3.    Defendants' Racketeering Activity Formed a Pattern ......................................... 44

4.    Defendants' Racketeering Activity and Violations of 18 U.S.C. § 1962(c) Directly and Proximately Caused Plaintiff's Injury............................................. 44

COUNT IV RICO SECTION 1962(d) (RICO CONSPIRACY) (BOTH DEFENDANTS) ....... 45

COUNT V UNFAIR BUSINESS PRACTICES, M.G.L. c.93A § 11 (BOTH DEFENDANTS)................................................................................................. 46

COUNT VI UNJUST ENRICHMENT (BOTH DEFENDANTS)............................................ 47

COUNT VII CIVIL CONSPIRACY (BOTH DEFENDANTS) ............................................... 48

COUNT VIII FRAUD (BOTH DEFENDANTS) ..................................................................... 49

PRAYERS FOR RELIEF ........................................................................................................ 49

JURY DEMAND ...................................................................................................................... 50

Plaintiff, the Government of Bermuda, acting by its Attorney General under the authority granted to him under section 71(1) of the Second Schedule to the Bermuda Constitution Order 1968 (UK SI 1968/182) as principal legal adviser to the Government of Bermuda, on personal knowledge as to himself and otherwise on information and belief, for Bermuda's Complaint against Defendants Lahey Clinic, Inc. and Lahey Clinic Hospital, Inc. (collectively, "Lahey" or "Defendants") hereby avers as follows:

## NATURE OF THE CASE

1.      This case arises from Defendants' creation and operation of one or more corrupt enterprises designed to exploit and unlawfully capitalize on the influence of Dr. Ewart Brown ("Brown"), the former Premier of Bermuda, longstanding Member of Bermuda's Parliament and owner of two private health clinics in Bermuda.  Over the course of nearly two decades, Lahey conspired with Brown to design and perpetuate an unlawful enterprise fueled by Lahey's payment of bribes to Brown disguised as "consulting fees," in return for which Brown facilitated and ensured that Lahey:  received preferential treatment when bidding on healthcare contracts issued by the Bermudian Government; obtained privileged access to Bermudian patients that it could service at its facilities in Massachusetts and in Bermuda; and made millions of dollars reading and interpreting medically unnecessary MRI and CT scans performed at Brown's clinics. The enterprise was wildly successful and resulted in the enrichment of both Lahey and Brown at the expense of the Bermudian Government and people.

2.      For his part in the scheme, Brown, while serving as Premier and in other high-ranking positions of public trust within the Bermudian Government and thereafter, ensured that Lahey became the overseas healthcare provider of choice for Bermudians, directed lucrative healthcare contracts to Lahey, secured a prestigious board appointment for Lahey at Bermuda's state-run hospital, actively exerted his influence to lobby for and obtain increased

reimbursements for diagnostic tests reviewed by Lahey employees in Massachusetts, and induced physicians to refer patients to his clinics for diagnostic testing by paying them kickbacks even where such testing was not medically necessary.

3.     Together, Lahey and Brown concocted a scheme built upon bribery and greed and carried out with complete disregard for Brown's position of public trust or for the physiological and psychological impact on patients who were subjected to excessive, medically unnecessary, and frankly dangerous scans so that Brown and Lahey could obtain greater reimbursements, which they split.  Bermudians soon ranked among the most scanned patients in the world, receiving nearly twice as many scans as nations with comparable populations.  Brown benefitted handsomely from the scheme, collecting millions of dollars in fees he split with Lahey, which enabled him and his wife, Wanda Henton-Brown, to purchase and maintain real property in the United States, including a home worth in excess of $3 million on Martha's Vineyard and apartments in New York, and properties in Turks and Caicos.  Lahey's revenues also grew substantially throughout its relationship with Brown.  For example, between 2006 and 2016, Bermudian public healthcare insurers paid Lahey over $40 million for services that Lahey provided in Massachusetts, and Brown paid Lahey hundreds of thousands, if not millions, of dollars in fees to interpret MRI and CT scans performed at his clinics.

4.     Bermuda brings this action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1961 et seq., to recover for injuries it has suffered to its business, property, and right to honest services as a direct and proximate result of Defendants' unlawful acts, including violations of wire and mail fraud statutes (18 U.S.C. §§ 1341, 1343, 1346), the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1, et seq., the Travel Act, 18 U.S. Code § 1952, the Money Laundering Control Act, 18 U.S.C. § 1956, and Massachusetts General

Laws c.271 § 39.  Bermuda also brings this action to recover for injuries suffered as a result of Defendants' unfair and deceptive business practices under Massachusetts General Laws c. 93A, § 11, and under the common law theories of conspiracy, fraud, and unjust enrichment. Defendants' unlawful activity and practices have resulted in Bermuda's payment of millions of dollars for medically unnecessary services and for contracts and other services tainted by bribes.

## PARTIES

5.      Plaintiff is the Government of Bermuda, acting by its Attorney General under the authority granted to him under section 71(1) of the Second Schedule to the Bermuda Constitution Order 1968 (UK SI 1968/182) and as principal legal adviser to the Government of Bermuda.

6.      Defendant Lahey Clinic, Inc. (a.k.a. Lahey Hospital & Medical Center, Burlington) is a non-profit academic medical center incorporated in Massachusetts with its principal place of business in Burlington, Massachusetts, and additional medical centers in Lexington and Peabody, Massachusetts, as well as several community and satellite offices throughout Massachusetts and New Hampshire.  In 2013, Lahey Clinic, Inc. changed its name to Lahey Hospital & Medical Center, Burlington.

7.      Defendant Lahey Clinic Hospital, Inc. is a non-profit academic medical center incorporated in Massachusetts with its principal place of business in Burlington, Massachusetts, and additional medical centers in Lexington and Peabody, Massachusetts, as well as several community and satellite offices throughout Massachusetts and New Hampshire.

## NON-PARTY CO-CONSPIRATORS

8.      Brown is a British Overseas Territories citizen and Bermuda status holder domiciled in Bermuda who, upon information and belief, maintains a seasonal residence at 34 Anthiers Lane, Oaks Bluff, Martha's Vineyard, Massachusetts, valued at more than $3 million. Upon information and belief, Brown renounced his United States citizenship in the 1990s.

Brown is the owner of Bermuda Healthcare Services ("BHCS"), a medical clinic which he has owned and operated since at least 1993, and the Brown-Darrell Clinic ("BDC" and, together with BHCS, the "Brown Clinics"), a medical clinic which he has owned and operated since 2007. Brown served as a Member of Bermuda's Parliament from 1993 through 2010, holding positions as Shadow Minister for Youth and Sport (1993 to 1995); Shadow Human Affairs Minister (1995 to 1998); Minister of Transport (1998 to 2003); Deputy Premier (2003 to 2006); Minister of Tourism and Transport (2004 to 2006); and Premier (2006 to 2010). He is and has been one of the most politically powerful individuals in Bermuda for more than two decades. Throughout his tenure in politics, Brown actively managed his private medical clinics and handsomely enriched himself through the schemes outlined herein.

9.      BHCS is a private medical clinic, located in Bermuda, owned by Brown. In exchange for a share of the reimbursement provided by insurers to BHCS, Lahey clinicians in Massachusetts read and interpret all MRI scans conducted at BHCS. From 1997 through March 2016, Lahey clinicians also traveled to Bermuda to see patients at BHCS. In 2012, Lahey provided Brown, acting on behalf of BHCS, with access to its preferential pricing relationships with manufacturers of scanning equipment to secure the purchase of a new MRI scanner in order to increase traffic to BHCS, increase reimbursements, and further the fraudulent scheme.

10.     BDC is a private medical clinic, located in Bermuda, owned by Brown. According to its website, BDC was the "brainchild" of its CEO, Mrs. Brown. Brown and his wife created BDC in 2007 and it opened in January 2008 to compete directly with the only other diagnostic testing facility on the island – Bermuda's only state-run hospital, King Edward Memorial Hospital ("KEMH") – and to generate income for Brown and Lahey. To effectuate the plan, Lahey provided Brown, acting on behalf of BDC, with access to its preferential pricing

relationships with manufacturers of CT scanning equipment. In exchange for a share of the reimbursement provided by insurers to BDC, Lahey clinicians in Massachusetts read and interpret all CT scans conducted at BDC.

## JURISDICTION AND VENUE

11. This Court has jurisdiction under 28 U.S.C. § 1331, because this action arises under the laws of the United States, and 18 U.S.C. § 1964(c), because this action alleges violations of the RICO Act, 18 U.S.C. § 1962.

12. This Court has diversity jurisdiction under 28 U.S.C. § 1332(a)(4) because Bermuda, a foreign state, is completely diverse in citizenship from all Defendants, and the matter in controversy exceeds, exclusive of interest and costs, the sum of seventy-five thousand dollars ($75,000).

13. This Court has supplemental jurisdiction over all claims asserted by Bermuda pursuant to 28 U.S.C. § 1367, as they are part of the same case or controversy.

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) and 18 U.S.C. § 1965, because Defendants are subject to personal jurisdiction in this judicial District, Defendants reside in this District, and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

### I.   BROWN'S RISE TO POWER IN BERMUDA.

15. Brown is a graduate of Howard University's College of Medicine. He also holds a Master of Public Health from the University of California. He obtained his license to practice medicine in the United States shortly after his graduation from medical school. Thereafter, he resided in Los Angeles, where he was a general practitioner for nearly two decades. Upon

information and belief, he received his license to practice in Bermuda in 1988, after being turned down in 1974 for failing the registration exam.

16.     In 1990, Brown returned to Bermuda and founded BHCS.

17.     Brown soon entered Bermudian politics.  In 1993, he was elected to Bermuda's House of Assembly as a member of the Opposition Progressive Labour Party ("PLP") and served as Shadow Minister for Youth and Sport.  In 1995, he became Shadow Minister for Human Affairs.

18.     In 1998, Brown became Bermuda's Minister of Transport, responsible for the public bus system, taxis, marine ports, ferries, licensing, and aviation.

19.     In July 2003, Brown was elected Deputy Leader of Party and Deputy Premier of Bermuda.

20.     In July 2004, Brown became Minister of Transport and Tourism.

21.     In October 2006, Brown was sworn in as Premier of Bermuda.  Following his swearing in, he reorganized his cabinet and retained for himself the positions of Minister of Tourism and Transport.  Brown remained Premier until he stepped down on October 28, 2010.

22.     Throughout his tenure in government service, as a public official, Brown owed fiduciary duties to Bermuda, including, but not limited to:  duties of loyalty and fidelity; the duty to act in good faith and in the best interests of the Government; the duty to ensure that there was no conflict between his official duties owed to the Government and his personal interests (including the interests of others); and the duty to ensure that he did not, without approval, profit from his position.

23.     Brown was also subject to the Ministerial Code of Conduct which, among other things, mandates that "Ministers are expected to behave according to the highest standards of

constitutional and personal conduct in the performance of their duties."  Pertinently, the Code

further mandates that:

a.   "Ministers must ensure that no conflict arises, or appears to arise, between their duties and their private interests;"

b.   "Ministers should avoid accepting any gifts or offers of hospitality which might, or might reasonably appear to, compromise their judgment or place them under an improper obligation;"

c.   "No Minister is justified, under any circumstances, in using official information which comes to him in his capacity as a Minister for his own private profit or for that of his friends and associates;"

d.   "No Minister should place himself, or allow himself to be placed, in a position which will tempt him to use his official influence to support any scheme or to advance any contract in which he has an undisclosed private interest;"

e.   "Minsters should not accept any kind of favour from individuals who are in negotiation with, or seeking to enter into contractual or proprietary or pecuniary relations with the Government."

24.     As a medical practitioner, Brown is also subject to the *Standards of Practice for Medical Practitioners*, promulgated in 2013 by the Bermuda Medical Council.  The *Standards* set forth, in part, relevant standards of practice with respect to financial and commercial dealings, sale of products, conflicts of interest and self-interest referrals.  Those *Standards* require physicians to "provide good clinical care," including "treatment that is safe, evidence-based and in the patient's best interests."  They further caution physicians to "avoid conflicts of interest which could affect patient care" and to "[b]e aware of conflicts of interest in relation to . . . diagnostic tests."

25.     Brown retained his medical practice throughout his tenure as an elected official and was actively engaged in the daily operations of the Brown Clinics, including their finances, and direct patient care.

II.   **FOR NEARLY TWO DECADES, LAHEY AND BROWN CONSPIRED TO PROMOTE LAHEY'S INTERESTS IN BERMUDA IN A SCHEME FUELED BY LAHEY'S PAYMENT TO BROWN OF BRIBES DISGUISED AS CONSULTING FEES.**

26.   For nearly two decades, Lahey and Brown conspired to promote and ensure Lahey's increased prominence as both a local and an overseas healthcare provider for Bermudians.

27.   Lahey's formal relationship with Brown began in 1997, while Brown served as Bermuda's Shadow Minister for Human Affairs and also Director of BHCS. Pursuant to an agreement between Lahey and Brown, Lahey began sending Massachusetts-based specialist physicians to Bermuda to service patients at BHCS. These physicians worked on Bermuda-related matters within and in connection with this Commonwealth.

28.   By 2001, Brown had continued his ascension through the Bermudian political system, and was then serving as Bermuda's Minster of Transport. At this time, the Defendants entered into the first of many consulting agreements between Lahey and Brown and Lahey and BHCS whereby Lahey agreed to pay Brown and BHCS substantial sums of money in exchange their promotion of Lahey's interests on the island.

29.   Upon information and belief, the first such consulting agreements ran from 2001 through December 2003; the second such agreements ran from January 2004 through December 2007; the third such agreement or agreements, as described below, ran from January 2008 through December 2009, with additional agreement(s) thereafter until approximately early-2016.

30.   In January 2007, several months after Brown's ascension to the role of Premier, Lahey donated $10,000 to Brown and his "Premier's Gala," a political fundraiser. The day after the Premier's Gala, Lahey and Brown "blended the two separate agreements that [Lahey] had with [Brown] and [his] company [i.e., BHCS] into one agreement." Upon information and

belief, Lahey and Brown "blended" these agreements to disguise the fact that Lahey had a foreign Premier on its payroll, notwithstanding the fact that Lahey had long-contracted with Brown while he served as a high-ranking Cabinet official privy to the highest levels of government secrets.  Regardless of this ruse, Brown still served as Director of BHCS, ran its operations, and evidently negotiated and ultimately approved all agreements between BHCS and Lahey.  There effectively was no distinction between Brown and BHCS.

31.     The consulting agreements called for Lahey's payment of "consulting fees" to Brown and BHCS and, in exchange, Brown and BHCS would "promote healthcare opportunities [for Lahey] in Bermuda and elsewhere in the West Indies."  As such, in exchange for Brown's use and exploitation of his role as a Government Minister to promote Lahey's interests in Bermuda, a clear conflict of interest, Lahey paid Brown bribes disguised as consulting fees.

32.     In 2001, those fees totaled at least $125,000 and, upon information and belief, they grew substantially over time.

33.     Upon information and belief, payments were made on a regular basis by check from Lahey in Massachusetts to Brown in Bermuda.

34.     Lahey actively negotiated the agreements with Brown in and from Massachusetts. For example, Lahey and Brown met at Lahey's Burlington campus on March 31, 2008 to discuss the third agreement, which ran, retroactively, from January 2008 through December 2009.

35.     Lahey rewarded Brown with increased consulting fees as Brown's influence, and in turn Lahey's, grew on the island, and as their fraud scheme became even more profitable with the proliferation of diagnostic testing at the Brown Clinics, explained further below.

36.     On July 11, 2008, for example, Lynn Malloy-Stofer, Lahey's then-Chief Operating Officer and Senior Vice President of Business Development, e-mailed Brown, who

was Premier at this point, at his official Government email address to inform him that she had obtained approval to raise his "consulting fees" by 9%, which she characterized as "a significant increase for Lahey Clinic."  Indeed, Lahey's profile on the island had increased substantially in 2008 as a result of Brown's assistance and Ms. Malloy-Stofer made sure to point out that Lahey had taken this into consideration.  Specifically, she noted that the proposed 9% increase was more than the "increases for the past two years [which] have been 6.5% and 6.1% respectively." She added that, by comparison, "[o]ur medical staff in April 08 received a 3% increase" and she agreed to make Brown's substantial increase retroactive by seven months to January 2008.  The agreement was for $504,000 ($42,000 per month).

37.     Ms. Malloy-Stofer's email further noted that she was happy "to see how [Brown's] leadership in Government has influenced the many changes" and that she hoped that Brown would accept the raise and that "we continue to move forward on our joint plans."  Brown accepted her proposal by reply email on July 29, 2008, and later met with her in September 2008, in Bermuda, to sign the contract.  Lahey's then-President and Chief Executive Officer, Dr. David Barrett, signed the agreement on September 18, 2008.  Following execution, Ms. Malloy-Stofer mailed a copy of the agreement to Mrs. Brown in Bermuda and noted that Lahey hoped "to work more closely with Bermuda, and in the spirit of the BHCS consulting role, [and hoped] to look to [Mrs. Brown] for insight and guidance and for bringing new opportunities to Lahey Clinic."

38.     Increasing the rate of Lahey's payments was important to Brown because he was reliant on the payments to fund his Clinics, which had to operate at capacity each month for him to stay personally solvent.  Although he drew a Government salary of approximately $200,000 annually, his personal financial situation was poor and highly leveraged.  From 2007 to 2009, for

example, he was servicing monthly commitments of over $65,000 out of just one of his personal bank accounts.

39. The hundreds of thousands of dollars that Lahey paid to Brown each year paled by comparison to the massive revenues Lahey reaped from having a Government Minister on its payroll to advance its political interests and ensure that it became the service provider of choice for Bermudians, both on the island and in the United States. Indeed, today Lahey alone holds a commanding share of the market for overseas healthcare services for Bermudians, in addition to its prominent position as an on-island services provider.

40. Increasing its revenues was of paramount importance for Lahey. While it is technically a non-profit organization, its management's compensation is, on information and belief, tied to its financial performance. Lahey's management was and is highly compensated. In each of 2013 and 2014, for example, Lahey's CEO earned approximately $1.7 million.

41. Notwithstanding Lahey's payment to Brown of increasing consulting fees, Lahey's "Consulting Policy" mandates that its own employees cannot receive compensation for "Consulting Services" that is not "fair market value."

42. Lahey's "Conflict of Interest Policy" further instructs that:

> All Lahey Colleagues must avoid any actual or perceived Conflicts of Interest to ensure that the Conflict of Interest does not affect, or appear to affect, patient safety, quality of care, research integrity, or interfere with Lahey's responsibility to the community it serves. For example, any situation where a Lahey Colleague may benefit financially, whether directly or indirectly (e.g., through a family member) as a result of that Colleague's position with Lahey is a potential Conflict of Interest.

43. Indeed, not only did Lahey's payments to Brown create a clear conflict of interest, but Lahey was well aware that its payment of bribes to Brown, and Brown's payment of kickbacks to referring physicians (as described below), was against the law. For example, its

Health Care & Corporate Compliance Plan, albeit in connection with federal healthcare programs, mandates that Lahey employees "shall not knowingly and willfully . . . offer to pay, pay, or receive any remuneration, either directly or indirectly, overtly or covertly, in cash or in kind, in return for" certain referrals and other commercial relationships "for which payment may be made in whole or in part," under any such program.  The Plan defines "remuneration" to include "kickback payments and bribes."

44.      In the Mission Statement set forth in Lahey's Health Care & Corporate Compliance Plan, Lahey states that it:

> recognizes that both deliberate and unintentional misconduct in the health care industry can undermine the efficient functioning of our health care system to the detriment of both our patients and all tax payers.  Each of us at Lahey has the responsibility to be knowledgeable about how these laws, rules, and regulations affect our jobs, and to perform our work and job-related responsibilities in a manner that is consistent with law, Lahey compliance policies, and Lahey ethical standards.

The Plan further states that Lahey employees must comply with, among others, "wire and mail fraud laws," "fraud and abuse laws," and "false statement and false claims laws."

45.      In addition to paying Brown ever-increasing "consulting fees," Lahey also made large donations to Brown's political party, the PLP, while Brown was in office.  In 2007, for example, Lahey donated $10,000 to the Premier's Gala fundraiser on January 13, 2007. Elizabeth Gray, then Administrative Director of Lahey's Executive-International Office, attended the gala, for which there are no free invitations.  Later that year, ahead of a general election in December 2007, Ms. Malloy-Stofer emailed Brown on November 5th to state:

> I only wish that we could vote.  Just learned of your announcement for a December 18th election.  Please know that you and Wanda are in our thoughts and prayers and we wish you upcoming success. Whatever the outcome, you will always be 'premier' in our minds.

She closed the email by asking **"*Is there anything that we might do to help?? – just ask*"** (emphasis added).

46.     Lahey made this donation and offer of assistance notwithstanding the Lahey Health Care & Corporate Compliance Plan, which states that:

> As an organization exempt from federal income tax under Section 501(c)(3) of the Internal Revenue Code, Lahey is prohibited from intervening in . . . any political campaign for a candidate for public office.  Thus, Lahey is prohibited from reimbursing individuals for expenses related to political campaigns and contributions.   In addition, it is against Lahey policy, and may be illegal, for Lahey Colleagues to do any of the following: [i]nclude political contributions on expense reports or any other account that causes Lahey to pay the expense; [i]nclude the cost of fund raising tickets for dinners for political functions on an expense account even if Lahey business is discussed; [u]se Lahey property, facilities or personnel time for any type of political activity; . . . [u]se Lahey's e-mail service to communicate personal opinions to elected representatives, government agencies, the media or other external organizations. . . .

47.     Brown similarly had an obligation to disclose his relationship with Lahey, but affirmatively concealed it.   Members of Bermuda's Parliament are required "to provide information of any pecuniary interest or other material benefit which a Member receives which might reasonably be thought by others to influence his or her actions, speeches or votes in Parliament, or actions taken in his or her capacity as a Member."   Members provide this information on a form entitled "Register of Interests."

48.     Brown failed to disclose his arrangement with Lahey on every Register of Interests that he completed in 2000, 2005, 2007, and 2010.  On March 24, 2000 and October 13, 2005, Brown acknowledged his obligation and responsibility to declare his business interests and other matters, but only disclosed his directorship in BHCS and the fact that he receives

remuneration from BHCS as a Medical Director.  No reference is made to Brown's unlawful arrangement with Lahey.

49.     On July 12, 2007 and July 10, 2010, Brown again signed the Registration Form and confirmed his shareholding in and directorship of the Brown Clinics.  He added that he only receives remuneration from BHCS, but never once disclosed his "consulting" relationship with Lahey or the bribes it was paying him.

### A.     Lahey Actively Exploited Brown's Role as Premier to Further Its Interests in Bermuda.

50.     Brown routinely used his role as Premier to introduce Lahey to high-ranking Bermudian officials and to ensure that Lahey got the access for which it paid him.  For example, on February 5, 2007, Ms. Malloy-Stofer mailed Brown to thank him "for offering Lahey the opportunity to meet with your Minister of Health et al to participate in the development of a future Urgent Care Center and future involvement of a 'new' hospital."  Brown responded: "You didn't know you were in the in-crowd?  (Smile)."  Lahey continued to be involved in the planning and development of the Urgent Care Center on Bermuda's East End as well as additional contracts for the hospital, as explained below, each time coordinating its work in and from Massachusetts.

51.     In 2007, Brown secured a $13.5 million, five-year contract to develop a long-term healthcare strategy for the island for a U.S.-based healthcare management and consulting company known as Kurron Shares of America, Inc. ("Kurron").  Kurron was owned by Mrs. Brown's former business associate, whom Brown knew he could control and get to work with Lahey.  As part of the project, various contracts would be awarded to medical partners, including Lahey, to re-imagine and revamp KEMH.  Brown ensured that Kurron obtained this contract by silencing opponents to Kurron's selection and removing them from the Bermuda Hospitals Board

("BHB"), the quasi-autonomous non-governmental organization responsible for the operation of KEMH.   Brown then facilitated the appointment to the BHB of his personal lawyer and confidante, who was also Kurron's lawyer, thus paving the way for the award to Kurron.

52.     In 2011, the Bermuda Government (specifically Paula Cox as Premier) terminated this contract with Kurron, which had been mired in scandal due to high payments to health consultants.

53.     Before Kurron was awarded the contract above, on March 27, 2007, Ms. Gray heard news that Johns Hopkins had been awarded a KEMH contract and immediately emailed Brown.  She stated:  "[u]nfortunately the news of the Hopkins relationship has spread and I am receiving feedback and inquiries as to why Lahey Clinic is not a participant.  *It is truly disappointing and not at all what we have discussed with you*" (emphasis added).   Brown responded to reassure her that day as follows:

> Beth:  Please relax!
> *No matter what you are hearing, Lahey will have the opportunity for involvement in the hospital.*
>
> What you are hearing is that JH was hired to review the Plan for the new hospital.  That was in place before I got the job.  *Do not worry and tell others that I said to relax* – unless they enjoy worrying (smile) [emphasis added].

54.     Approximately one month later on April 23, 2007, Ms. Malloy-Stofer also impatiently emailed Brown regarding a request for proposals that "went out from the hospital planning board and [stated] that Hopkins, among other interested parties, are attempting to get the contract to manage the hospital."  She asked that Brown "*[p]lease let [her] know how to advance Lahey's interests*" (emphasis added).   Brown responded that Lahey should "*[l]et [K]urron compete and Lahey's interests will be protected*" (emphasis added).  In essence, he

informed her that Lahey would receive work from the hospital regardless of whether or not it won the bid.  In short, the bid was fixed from the start.

55.     Lahey never bid on the RFP; in fact, Lahey was the only organization approached by the BHB to submit a bid that declined the offer to do so.

56.     On May 8, 2007, just two weeks after Brown instructed Lahey not to bid on the RFP, the Cabinet met and discussed the responses that the BHB received (i.e., from Hopkins and Kurron), and overwhelmingly supported awarding the contract to Hopkins notwithstanding a technical error in its proposal.  On information and belief, at that meeting, Brown advocated *against* awarding the contract to Hopkins, stating that it would be a conflict of interest for Hopkins to manage KEMH while continuing to refer Bermudians to Johns Hopkins Hospital in the United States.  In so doing, Brown (1) advocated that Kurron receive the contract, and (2) ensured that Lahey would avoid any perceived conflict of interest and retain its ability to service patients at its campus in Massachusetts (for which it has since been paid tens of millions of dollars) while also remaining eligible to receive subcontracts from Kurron.  The Cabinet then approved the contract award to Kurron.

57.     Four days later, on May 12, 2007, Brown wrote Ms. Malloy-Stofer and provided her with access to inside, non-public information, stating:   "Kurron won the hospital management contract last week.  (Has not been made public yet)."

58.     Brown followed through on his promise that Lahey would receive work from Kurron.  In July 2007, he publicly announced a new partnership between KEMH and Lahey wherein Lahey physicians would travel to Bermuda from Massachusetts and see patients at the state-run hospital.  By this point, Lahey doctors had already been traveling to Bermuda to see patients at BHCS for ten years, and Brown had been collecting his secret "consulting" fees from

Lahey.  Later that month, on July 19, 2007, Brown emailed Ms. Malloy-Stofer to thank her for her "sweet message" – wherein she lavished praise on Brown's work in Bermuda.  He added that "[i]ts [sic] so important that Lahey stay front and center in Bermuda . . . ."  Staying "front and center," however, would come with the price of deceiving the Bermudian people and denying them the benefit of honest services untainted by bribery.

59.     In 2008, a separate company, Kurron Bermuda, was awarded an annual $1.3 million contract to develop "FutureCare," a public insurance plan for individuals over 65.  Brown used his influence and connections to ensure that Lahey was favored over other potential U.S. healthcare providers, including Johns Hopkins, for lucrative contracts relating to "FutureCare."  Even today, Lahey remains a preferred provider of FutureCare overseas services.  Between 2010 and 2016, FutureCare, together with the Health Insurance Plan ("HIP"), a basic government-funded health plan for persons of all ages, has paid Lahey over $10 million for services Lahey performed at its facilities in Massachusetts, which is nearly *seven times* more than the next highest-grossing overseas provider.

60.     As the work on KEMH's redevelopment proceeded, on August 29, 2008, Ms. Malloy-Stofer emailed Brown that she "was rather surprised to read [of a BHB] announcement regarding [an advertised] cancer relationship between Dana Farber and [KEMH]."  She implied that such an announcement may cause patients to turn on Lahey and noted that "[w]e have been proactively working with the hospital, its leadership and its physicians for years and have spent significant time responding to the needs of the hospital and the physicians on the island" and suggested that she would request that the BHB make a similar announcement about Lahey.  In response, Brown offered to speak with the BHB's Chief of Staff and connect him with Lahey directly.

61.     In or around 2009, Brown was also instrumental in securing a prestigious appointment for Lahey as a Clinical Advisor for KEMH's General Surgery and Outpatient Care services.  Brown's personal lawyer and confidante was Deputy Chair of the BHB when it appointed Lahey a Clinical Advisor.

62.     Months later, in January 2009, Ms. Gray mailed Brown to inform him that she would be on the island in mid-January with Lahey's Telemedicine team and asked for meetings with Brown and with the Minister of Health.

**B.      Lahey's Relationship with Brown Has Made It the Leading Foreign Provider of Healthcare Services On and Off the Island Today.**

63.     Because of Lahey's continued payments to and exploitation of Brown, past and present, Lahey's influence has never been more visible both on the island and off the island, as an overseas healthcare provider to Bermudians, than it is today.

64.     For example, Lahey is part of HIP and FutureCare's Overseas Preferred Provider Network.  As a result of its status as a "Preferred Provider" for services performed off the island (i.e., "overseas care"), which Brown helped it achieve, Lahey services more Bermudian patients from its campus in Massachusetts than any other U.S.-based provider.  Hundreds of Bermudians travel to Lahey in Massachusetts each year for treatment.  HIP pays 60% of usual and customary charges for medically necessary services not available in Bermuda for in-network providers, such as Lahey, and 50% for out-of-network providers.  "FutureCare" pays 75% of usual and customary charges for medically necessary services not available in Bermuda for in-network providers, such as Lahey, and 65% for out-of-network providers.

65.     For services rendered by overseas providers, such as those Lahey performs at its Massachusetts locations, the providers submit claims for reimbursement from Bermudian insurers to addresses in the United States and in Bermuda.  Those claims are then reviewed and

adjudicated by Bermuda's claims processing agents in the United States and Canada pursuant to policies set by the Bermudian Government. Through these agents, which specialize in cost containment, Bermuda negotiates agreements for covered services and established rates with overseas providers. Payment for services, once approved, is made from and/or through Bermuda's bank accounts, or those of its agents, in the United States.

66.     Lahey also services Bermudians remotely from its campus in Massachusetts. For example, in or around 2009, Lahey leased a 'RP-7' robot to KEMH, thereby further building on the momentum of its increasingly close relationship with KEMH. The robot allows over 90 doctors at Lahey in Massachusetts to provide remote consultations to patients in Bermuda. Lahey physicians now not only read diagnostic scans in and from Massachusetts, but they provide direct care without ever boarding a plane. Lahey is then reimbursed for these services by the Bermuda health plans. In 2010, the remote robot consultations were occurring at a rate of approximately 20 per month.

67.     In March 2016, Lahey expanded its visiting specialist program by moving to fixed physical space at the Mid-Atlantic Wellness Institute, a BHB-run health clinic. Lahey made the move after nearly two decades of servicing patients out of the Brown Clinics and against the backdrop of increasing Government scrutiny of diagnostic testing in Bermuda.

## III.     LAHEY, BROWN, AND THE BROWN CLINICS FURTHER THEIR FRAUDULENT SCHEME AND GENERATE HUGE RETURNS THROUGH THE USE OF MEDICALLY UNNECESSARY DIAGNOSTIC IMAGING.

68.     Lahey, Brown, and the Brown Clinics have conducted excessive and medically unnecessary diagnostic imaging in order to increase the reimbursements they received from health insurers and, in turn, their revenues. On information and belief, Lahey has retained its revenue from the scheme in Massachusetts and reinvested it in the enterprise to fund further bribes to Brown so that he would promote its interests on the island.

69. On information and belief, from at least 2005 through the present, Lahey has read every MRI scan performed at BHCS and every CT scan performed at BDC (which collectively number in the thousands).

70. Pursuant to exclusive contracts between Lahey and the Brown Clinics, which are separate from Lahey's consulting agreements with Brown and BHCS, Lahey reads reports for patients scanned at the Brown Clinics in exchange for a fee. On information and belief, Brown pays Lahey's fee out of the money he receives from the insurers after submitting claims for reimbursement. As a result of the fraudulent enterprise, MRI and CT scanning on the island increased exponentially, resulting in the Brown Clinics conducting, Lahey interpreting, and Brown submitting claims for reimbursement for thousands of medically unnecessary tests. Indeed, as noted below, CT scans at BDC for beneficiaries of Bermuda's public healthcare plans increased nearly three-fold in just one year between 2009 and 2010.

71. The imaging results for patients scanned at the Brown Clinics are forwarded electronically from Bermuda to Lahey in Massachusetts for interpretation. Lahey's employees in Massachusetts read the scans and electronically forward their reports back to the Brown Clinics within 24 hours using Lahey's Picture Archival Communications System ("PACS"). Lahey employees resident in Massachusetts actively assisted the Brown Clinics with their management of the PACS system. In 2008, Lahey also assisted Brown with the purchase of a server in order to improve connectivity with Lahey's campus in Massachusetts. Because Lahey's vendor would not ship the server directly to Bermuda, Lahey agreed to accept delivery in Massachusetts, where it configured the server before sending it to Brown in Bermuda.

72. In 2012, Lahey once again obtained preferential pricing through its vendors for Brown's purchase of an expensive new MRI system for BHCS unveiled on September 8, 2013.

73.     Lahey and Brown reviewed their exclusive service agreement for Lahey's interpretation of the scans "annually and [Lahey has] increased fees annually."   Nonetheless, Brown actively pushed for deep discounts on Lahey's interpretation services, which Lahey willingly granted.  These discounts enabled Brown to keep a larger portion of the reimbursement he received from the Bermudian Government and other insurers, without passing the savings on to the patient or the insurer.  The benefits Lahey received from exploiting its relationship with Brown – and the support and influence it received from a Minister, Premier, owner of two of only three testing centers in Bermuda, and individual with influence on the island – were far more valuable.

74.     Even with deep discounts, however, Brown and his Clinics still struggled to keep up with their payments to Lahey.  In September 2008, for example, Ms. Malloy-Stofer emailed Mrs. Brown and noted that the accounts receivable for Lahey's reading of the Brown Clinics' MRI and CT scans were well past-due.  Rather than demand immediate payment, she offered to retroactively apply a recently-negotiated discount against the bill to bring down the total.  She made clear that her actions were not borne from generosity, but rather they were just another means by which Lahey bribed Brown for his continued influence and assistance in gaining an advantage for Lahey in connection with its business interests in Bermuda.  She closed her email as follows:  "as we hope to work more closely with Bermuda, and in the spirit of the BHCS consulting role, *I hope to look to you for insight and guidance and for bringing new opportunities to Lahey Clinic*" (emphasis added).  In the same email, Ms. Malloy-Stofer noted that Lahey and Brown had just executed an extension of their consulting agreement.  Lahey therefore was willing to continue to pay consulting fees to Brown in exchange for the significant

benefit he offered them in Bermuda, notwithstanding his delinquent remittance of MRI and CT scanning fees to Lahey.

75.     As of September 2008, when Brown and Lahey were negotiating the consulting contract extension discussed above, the Brown Clinics owed Lahey over $514,000 for interpretation fees, including $131,400 in past-due MRI interpretation fees for 2007, $258,000 in MRI interpretation fees for 2008, and $124,860 for CT interpretation in 2008.  On September 18, 2008, the same day Lahey's CEO signed the consulting agreement extension, Brown instructed his Clinics' administrator not to send the full payment, and only to send partial payments.  She complied by sending the 2007 balance to Lahey that day.

76.     Upon information and belief, Lahey used the fees Brown paid it for reading scans to fund its payment of consulting fees to Brown, to fund its purchase of the robot for KEMH, to fund travel to and from the island, and to further perpetuate the unlawful scheme.

77.     From 2005 through at least 2014, Lahey read *thousands* of test results each year for the Brown Clinics, resulting in significant interpretation fees for Lahey.

78.     For example, between 2008 and 2016, the Brown Clinics submitted nearly 8,000 claims for MRI and CT services just to the Government Employees Health Insurance ("GEHI") plan, which covers government employees, for which they were reimbursed over $10 million.  GEHI is governed by the Government Employees (Health Insurance) Act 1986.  The Act provides that GEHI covers "pathological studies, X-rays and other diagnostic procedures which are obtainable in a doctor's clinic or in a private laboratory for the purpose of assisting in diagnosis and treatment:  expenses incurred which the Committee shall approve as being reasonable and customary."

79.     Relatedly, GEHI also pays for essential treatment, consultation, or technical investigation conducted at overseas providers.  Between 2006 and 2016, GEHI paid Lahey over $29 million for services Lahey performed at its facilities in Massachusetts.

80.     Upon information and belief, Lahey continues to interpret scans for the Brown Clinics today, and thus continues to perform a function critical to Brown's ability to seek reimbursement for the scans.  Each medically unnecessary scan that Lahey interprets, and each report that it issues results in at least two false representations:  (1) the report itself; and (2) the claim for reimbursement.

81.     Lahey fully understands its duty to prevent the submission of medically unnecessary scans for payment, having stated in its Health Care & Corporate Compliance plan that conduct prohibited by certain fraud and abuse laws includes "falsely certifying that services were medically necessary."  Indeed, no one was better positioned than Lahey, which read all scans conducted at the Brown Clinics, to detect medically unnecessary scans.  Lahey could also draw upon its experience with its scanning operations in the United States to determine that the sheer volume and nature of the scans performed at the Brown Clinics, as outlined below, was problematic.  Nevertheless, Lahey and Brown carried on the scanning scheme, at the expense of Bermuda's insurers and Government and citizens, even though they must have known for several years that it was producing an extreme level of unnecessary and possibly dangerous scans at a rate disproportionate to like nations.  Blinded by its obvious desire to keep its "consulting" relationship with Brown intact and also by lucrative scanning fees and an ever-increasing presence on the island, Lahey stayed silent.

82.     Lahey was also directly involved in assisting with certain scans performed at the Brown Clinics from its campus in Massachusetts.  For example, in 2011, Lahey and BDC

announced a lung cancer screening program.  An October 4, 2011 news article regarding the announcement notes that "the local physician fills out a form which goes to a radiologist specialist at the Lahey Clinic. Based on the information from the local physician, the Lahey specialist gives specific instructions on how to carry out the scan including where the patient should be positioned."

### A.   Brown Actively Pressured Public Officials to Increase Rates and Induced Physicians to Increase Referrals for Diagnostic Testing.

83.     In Bermuda, insurers are required to provide to each insured a minimum package of benefits called Standard Health Benefits ("SHB"), as defined by the Health Insurance (Standard Health Benefit) Regulations 1971.  The SHB consists of inpatient, outpatient, home medical services and other benefits, including MRI and radiology (and CT) testing.

84.     The Bermudian Government subsidizes payment of SHB for certain Bermudians. For instance, the Government currently subsidizes 100% of SHB claims for children and full-time students between the ages of 19 and 22, 100% for persons designated as indigent, 70% of SHB claims for seniors age 65 to 74, and 80% for seniors aged 75 and up.  Prior to April 1, 2014, the subsidy for seniors was higher covering 80% of SHB claims for seniors age 65 to 74 and 90% for seniors aged 75 and up.

85.     A Standard Premium Rate (SPR) for the SHB is determined annually by the Ministry of Health, Seniors and Environment after assessing the claims experience of all insured participants.  Approved changes to the SPR have an impact on the costs of premiums paid by the insured population and the level of subsidies provided by the Government.

86.     In part as a result of the conduct of Lahey, Brown, and the Brown Clinics, as described herein, the SPR more than doubled between Fiscal Year 2007 ($140.92) and Fiscal Year 2016 ($338.07).

87.     A health insurance provider cannot charge more than the SPR to insured persons for the SHB.  The SPR allows all insured persons to access the same basic level of SHB health insurance coverage for the same price regardless of their health status.

88.     The Bermuda Health Council also annually sets a Schedule of Diagnostic Imaging Services and Fees for Approved Facilities that applies to diagnostic imaging services and fees covered under the SHB.  The Brown Clinics have their own, separate fee schedule.   In 2015/2016, the fee for each MRI scan at BHCS was set at $1,301.  CT scans at BDC ranged from $760 (e.g. "CT angiography, neck with contrast material(s) including noncontrast images, if performed, and image postprocessing") to $2,862 per scan (e.g. "CT, soft tissue neck; without contrast material followed by contrast material(s) and further sections").

89.     The costs of the scans are charged directly by the Brown Clinics to the patient's insurer, including, but not limited to, HIP, FutureCare, and GEHI, which cover diagnostic testing at approved rates.

90.     Brown   constantly   applied   pressure   to   government   officials   to   increase remuneration for tests undertaken by the Brown Clinics and read by Lahey, notwithstanding their already high price tag.  Given that Lahey would receive a substantial percentage of Brown's reimbursement for each scan, any increase in the fees insurers paid Brown for imaging services resulted in increased remuneration for the Brown Clinics, Brown, and Lahey.  Likewise, their respective revenues also increased proportionally with the number of scans performed.

91.     For example, in or around March 2008, within months of securing a new CT scanner for BDC with Lahey's assistance, Brown and his surrogates implored the Health Insurance Association of Bermuda to raise reimbursement rates.  He succeeded.

92.     To induce patient referrals for diagnostic scanning at the Brown Clinics, Brown also offered and paid kickbacks, which he dubbed and disguised as "commissions," ranging from between 5% to 17.5% of reimbursements, to local physicians.

93.     Brown scolded those same physicians when their patients cancelled their scans, thus depriving Brown (and Lahey) of revenue.  For example, in September 2008, Brown emailed one such physician and stated:  "Two of yours cancelled because 'they are feeling better'!  Not good doc!"  Brown later responded:  "You must screen better so that [patients] won't 'get better' and think they don't need the CT."

**B.     MRI and CT Use Skyrockets in Bermuda and at the Brown Clinics.**

94.     As noted above, Lahey read all MRI and CT scans conducted at the Brown Clinics.

95.     Between 2004 and 2012, CT scanning in Bermuda more than doubled, from 75.0 CT scans per 1000 to 171.4 scans per 1000 in 2012.  By contrast, the Cayman Islands, which has a population only slightly smaller than Bermuda, registered 57.5 scans per 1000 in 2012.

96.     Similarly, between 2004 and 2012, MRI use in Bermuda more than doubled, from 41.1 scans per 1000 in 2004 to 84.4 scans per 1000 in 2012.  The Cayman Islands registered 27.1 scans per 1000 in 2012.

97.     Bermuda now registers among the highest users of MRI and CT scans in the world; likewise, the cost of healthcare per person in Bermuda is also among the highest in the world, rising from $7,000 per person in 2007 to $11,297 in 2013.

98.     At the Brown Clinics, the rate of scanning of beneficiaries of public insurers met or exceeded the national averages.  For example, CT use increased more than three-fold at BDC between 2009 and 2010.  MRI use at BHCS likewise nearly doubled between 2008 and 2012.

99.     Bermuda had to make special financial provisions to cover the associated increase in costs.  For example, in 2013, Bermudian officials attempted to implement a "pre-certification" requirement, which would have required a specialist to see a patient before that patient could be sent for a scan.  Brown came out vociferously against this requirement.

100.     Brown was well-aware that physicians in his practice order more scans than other physicians in Bermuda.  For example, in a September 2, 2016 interview with Bermuda's <u>Royal Gazette</u> newspaper, Brown admitted:  "I know that [BDC physician Dr. Reddy] orders more. . . . Some months he is the highest.  He has more referrals to MRI and CT than anyone else of the 50-something doctors who refer patients."

### C.     Physiological and Psychological Risks of Overscanning.

101.     Overscanning not only leads to increased healthcare costs, but it also has the potential to cause even greater physiological and psychological harm.  A typical CT radiation dose is 10 to 20 millisieverts (mSv), which is associated with a lifetime risk of fatal cancer of approximately one per 2,000 CT scans.  Doctors have noted that "[t]he radiation exposure from three or four CT scans is roughly equivalent to that experienced by atomic bomb survivors in Japan who were located one to two miles from" the blast.

102.     Gadolinium IV contrast used in MRIs can also cause nephrogenic systemic fibrosis ("NSF"), a disease that may resemble skin diseases, such as scleroderma and scleromyxedema, with thickening and darkening developing on large areas of the skin.  NSF can also affect internal organs, such as the heart, kidneys and lungs, as well as a disabling shortening of muscles and tendons in the joints.  Exposure to gadolinium contrasting agents during MRIs can be especially dangerous, or even fatal, for patients with advanced kidney disease.

103.     Lahey knew that Gadolinium IV contrast can be harmful to patients.  In 2015, Dr. Wald, Chairman of Radiology at Lahey and a champion of Lahey's relationship with the Brown

Clinics, told a Bermudian newspaper that "I think it is critical that the physician [who ordered the scan] and the radiologist [i.e., at Lahey] who approves it consider for each individual patient whether the benefits of the test outweigh the risks." He said it was a "very tricky business to generate the right level of medical understanding" in patients when they require medically necessary tests as they could not be expected to truly balance the benefit of the exam with the risk of harm from gadolinium themselves.

104.    False positives are another real and potentially traumatic downside to overscanning. MRIs, for example, can pick up many abnormal findings that can often confuse the clinical picture and lead to uncertainty, psychological harm to the patient, and possibly even to avoidable additional and costly testing.

## IV.    LAHEY, BROWN, AND THE BROWN CLINICS PROFIT WILDLY FROM THEIR COLLABORATION.

105.    The illegal acts and course of conduct outlined above resulted in mounting returns for Lahey and Brown. Indeed, as shown above, Brown's consulting fees increased dramatically throughout the course of the parties' relationship and soared exponentially during his time as Premier (while he actively shaped government policy to extend use of Lahey's services across Bermuda and overseas in Massachusetts).

106.    Upon information and belief, Lahey paid Brown millions of dollars in "consulting fees" through at least March 31, 2016. Likewise, Bermudian public healthcare insurers paid Lahey over $40 million for services Lahey performed in the United States – services Lahey would not have received but for its relationship with Brown.

## V.    LAHEY AND BROWN TRANSACTED BUSINESS IN AND FROM MASSACHUSETTS.

107.    Lahey directed, controlled, and or participated in the enterprises and schemes outlined above from Massachusetts in a variety of ways, including:

a. Servicing patients in Massachusetts who traveled from Bermuda, and submitting claims from Massachusetts directly to addresses for Bermudian insurers in the United States to be paid from or through bank accounts located in the United States (amounting to over $40 million from Bermudian public insurers since 2006);

b. Coordinating and sending its specialists from Massachusetts to Bermuda;

c. Negotiating and signing contracts in Massachusetts;

d. Maintaining the PACS system in Massachusetts and coordinating remote information technology services for the Brown Clinics' use of the PACS system;

e. Receiving equipment in Massachusetts and shipping it for use at BDC;

f. Paying Brown's consulting fees from accounts controlled from Massachusetts;

g. Authorizing payments to Brown from its headquarters in Massachusetts;

h. Receiving payment for interpreting scans performed at the Brown Clinics;

i. Receiving scans conducted at the Brown Clinics, reading those scans, and transmitting its findings;

j. Corresponding by email with Brown, Mrs. Brown, Kurron, and others;

k. Remotely operating robots at KEMH from Massachusetts; and

l. Remotely consulting with respect to patients seen at BHCS, BDC, and KEMH from Massachusetts.

108. Upon information and belief, Brown made several trips to and communicated with persons in Massachusetts to negotiate the terms of the parties' various agreements and the scope of Lahey's work in Bermuda throughout the course of the parties' relationship.

109.    Bermuda has and continues to transact business in Massachusetts.  For example, Bermuda, either directly or through its agents, adjudicated claims for services rendered by Lahey in Massachusetts, approved or denied payment to Lahey for those services, negotiated rates with Lahey and other Massachusetts-based healthcare providers, and accepted and advertised Lahey as a preferred provider in its overseas health network.  Bermuda also worked with Lahey on contracts that Lahey received from the Government.

## VI.    DEFENDANTS' FRAUDULENT CONCEALMENT OF THE SCHEMES TOLLS ANY APPLICABLE STATUTE OF LIMITATIONS.

110.    In order for Brown to avoid internal conflicts with his own party, potential criminal charges as well as public ridicule while maintaining a steady stream of revenue for himself and his Clinics, and in order for Lahey to continue to reap huge returns from Brown's pedaling of its expansion agenda, Defendants' scheme depended on their concealment of their activities.  Indeed, at no time did Brown disclose his financial relationship with Lahey on his Register of Interest Forms or did Lahey disclose its payment of "consultancy fees" to Brown.

111.    Even in the exercise of reasonable diligence, Plaintiff could not have learned that Lahey had been bribing Brown to exploit his position as a Premier, Government Minister, and Director of the Brown Clinics.

112.    Any applicable statutes of limitation have been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein and by a tolling agreement entered by the parties on October 12, 2016, and tolling the period through April 12, 2017.  Even with the exercise of reasonable diligence, the Plaintiff could not have become aware of the allegations herein or appreciated their scope within any accrual period.  Plaintiff has been kept in ignorance of vital information essential to the pursuit of these claims, without any fault or lack of diligence

on its part.  Plaintiff could not reasonably have discovered the fraudulent nature of Defendants'

conduct.

## VII.  DEFENDANTS' PATTERN OF RACKETEERING ACTIVITY CAUSED INJURY TO PLAINTIFF'S BUSINESS AND PROPERTY.

113.   As set forth above, over the course of nearly two decades, Defendants operated

one or more corrupt RICO enterprises and sub-enterprises with the common purpose of

exploiting Brown's roles as Government Minster, Premier, and physician entrepreneur in order

to unfairly and unlawfully defraud the Bermudian Government of millions of dollars and deprive

its people of the right to honest services.   The fraudulent schemes and resulting injury to

Bermuda and its citizens can be summarized as follows:

a.   In exchange for Brown's use and exploitation of his role as a Member of

Parliament and later Premier in order to promote Lahey's interests in Bermuda,

and pursuant to written "consultancy agreements," Lahey bribed Brown with

ever-increasing consulting fees in violation of the Foreign Corrupt Practices Act

(15 U.S.C. §§ 78dd-1, et seq.), the Travel Act (18 U.S. Code § 1952), the Money

Laundering Control Act (18 U.S.C. § 1956), the Massachusetts Commercial

Bribery Statute (G.L. c.271 § 39), and mail and wire fraud statutes (18 U.S.C. §§

1341, 1343, 1346).   As a result, Brown exercised his influence throughout the

island at Lahey's behest and on Lahey's behalf.   Brown ensured that Lahey

received preferential treatment when bidding (and, indeed, even when not

bidding) on healthcare contracts, facilitated profitable introductions between

Lahey and key government players and contractors, secured a prestigious board

appointment for Lahey with Bermuda's state-run hospital, actively exerted his

influence to lobby for and obtain increased reimbursements for diagnostic tests

reviewed by Lahey employees in Massachusetts, induced physicians to increase referrals to the Brown Clinics for those diagnostic tests by paying them kickbacks, and ensured Lahey obtained a prominent position as an overseas healthcare provider.  But for Defendants' improper conduct, Plaintiff would not have been the victim of corrupt bidding processes or the recipient of dishonest services from an elected government official or Lahey itself, it would not have paid for the unnecessary tests or so dramatically increased its reimbursement rates, nor would it have paid Lahey for its corrupt services from or through its United States bank accounts.

b.  Furthermore, Brown helped ensure that Lahey made millions reading MRI and CT scans for his Clinics.  The Brown Clinics were reimbursed for scans they conducted and, pursuant to written services agreements, Brown paid Lahey to read those scans.  To increase payments to the Brown Clinics and Lahey, the Brown Clinics conducted scans at a rate that indicates that they were not medically necessary.  In furtherance of their fraudulent scheme, and solely to enrich himself, the Brown Clinics, Lahey, and the enterprise, Brown used his influence to lobby government regulators to increase reimbursement fees for already-expensive diagnostic tests and to induce physicians to increase referrals to his Clinics by paying them kickbacks and pressuring them to increase referrals. Defendants' actions succeeded in ranking Bermudians among the most scanned patients in the world.  Notwithstanding its review of nearly every scan conducted at the Brown Clinics since 2005, and thus perfect positioning to detect and to put a stop to medically unnecessary scanning, Lahey turned a blind eye and

deliberately participated in the scheme rather than jeopardize its lucrative "consulting" relationship with Brown described above.  Defendants' actions had the direct and proximate effect of increasing the premiums for SHB benefits, and causing Bermuda to pay millions of dollars for medically unnecessary imaging and increased healthcare costs which has been exported to Lahey in Massachusetts pursuant to contracts negotiated in Massachusetts.

## VIII.  USE OF THE MAILS AND WIRES IN FURTHERANCE OF UNLAWFUL SCHEME.

114.    Defendants used thousands of mail and interstate wire communications to create and manage the fraudulent schemes described above.

115.    Defendants' use of the mails and wires to perpetrate their fraudulent scheme involved thousands of communications throughout the period, including, but not limited to:

   a.   Scans sent from BHCS and BDC employees to Massachusetts to be reviewed by Lahey employees from, at least, 2005 to the present;

   b.   Thousands of reports of those scans sent from Massachusetts to Bermuda and/or uploaded to Lahey's PACS database;

   c.   Multiple bank drafts sent from Lahey in Massachusetts to Brown in Bermuda for payment of his "consulting fees;"

   d.   Monthly payments for Lahey's interpretation services sent from Brown in Bermuda to Lahey in Massachusetts from at least 2005 to the present, including a September 2008 payment of $131,400;

   e.   Email and telephonic correspondence between Brown, BHCS, BDC and Lahey for the purpose of carrying out the schemes outlined above, including, but not

limited to, telephonic correspondence between the Brown Clinics and Lahey regarding the lung cancer scans described above; and

f.  Email correspondence between Lahey and KEMH for the purpose of carrying out the schemes outlined above.

## IX.   USE OF FOREIGN TRAVEL TO PROMOTE UNLAWFUL ACTIVITY.

116.   Lahey employees and Brown traveled in interstate or foreign commerce with intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of unlawful activity, including, but not limited to, bribery of a foreign official.

117.   Defendants' travel in interstate or foreign commerce included, but was not limited to:

a.  Regular visits by Lahey employees to Bermuda over a period of approximately 20 years to provide specialist services at BHCS and KEMH;

b.  Trips to Bermuda by Lahey employees for the purpose of negotiating Brown's "consulting agreement," including, but not limited to, a September 2008 meeting at which Brown signed that consulting agreement;

c.  Trips by Brown to Massachusetts for the purpose of negotiating his "consulting agreement" including, but not limited to, a March 2008 meeting at Lahey;

d.  Trips to Bermuda by Lahey employees to attend and make donations at political fundraisers, such as the 2007 Premier's Gala on January 13, 2007; and

e.  Trips by Brown to the United States for the purpose of meeting with Kurron regarding the schemes outlined above.

## COUNT I
## RICO SECTION 1962(a)
### (Both Defendants)

118.   The allegations of Paragraphs 1 to 117 are incorporated by reference as if set forth fully herein.

119.   Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(a).

**1.     Lahey and/or Lahey, Brown, and the Brown Clinics constitute an enterprise engaged in foreign commerce.**

120.   Lahey and/or the association-in-fact of Lahey, Brown, and the Brown Clinics is an enterprise (the "Enterprise") engaged in and whose activities affect foreign commerce.  The Enterprise had a distinct purpose to enrich Defendants, Brown, and the Brown Clinics and to enhance Defendants' profile and give it a business advantage on Bermuda.  The Enterprise had a distinct structure honed over nearly two decades and memorialized in several consulting and professional services agreements.

**2.     The Enterprise used and invested income derived from a pattern of racketeering activity.**

121.   Lahey used and invested income that was derived from a pattern of racketeering activity in the Enterprise to further its influence and interests in Bermuda, including, but not limited to, by:  accepting fees for reading medically unnecessary scans and for services rendered in Massachusetts tainted by bribes and using those fees to pay Brown increasing bribes, disguised as consulting fees, to promote its interests in Bermuda; reinvesting additional proceeds gained as a result of Brown's efforts to proliferate Lahey's interests in Bermuda; sending visiting specialists to the Brown Clinics and, later, KEMH; purchasing a robot and leasing it to KEMH;

and assisting with the purchase of MRI and CT scanners and peripheral equipment and software for the Brown Clinics.

123.     The Defendants played integral roles in the Enterprise and its operations.  Without their participation in the Enterprise's operations, the Enterprise would not have been able to conduct its activity.

123.     The Enterprise's racketeering activities include at least mail and wire fraud (18 U.S.C. §§ 1341, 1343, 1346), violation of the Travel Act (18 U.S.C. § 1952), violation of G.L. c.271 § 39, violation of the Foreign Corrupt Practices Act (15 U.S.C. §§ 78dd-1), and violation of the Money Laundering Control Act (18 U.S.C. § 1956).

### a.      Mail and wire fraud.

124.     The Defendants' scheme necessarily involved multiple violations of the mail and wire fraud statutes, because, as explained above, their scheme to defraud could not have functioned without phones, emails, and wire transfers.

### b.      Travel Act.

125.     The Defendants violated the Travel Act by traveling in foreign commerce and by using facilities of interstate and foreign commerce (including, without limitation, mail, wire, and e-mail) with the intent to promote, manage, establish, carry on, and facilitate the promotion of unlawful activity, including, but not limited to (1) bribery in violation of the Foreign Corrupt Practices Act (15 U.S.C. §§ 78dd-1) and the Massachusetts Commercial Bribery Statute (G.L. c.271 § 39), and (2) money laundering (18 U.S.C. § 1956).

### c.      G.L. c.271 § 39.

126.     The systematic bribery by the Defendants is a "racketeering activity."  18 U.S.C. s.1961(1) ("racketeering activity" means (A) any act or threat involving … bribery [under state law] …").  The Defendants' conduct violated Massachusetts's Commercial Bribery Statute.

127.    As bribes to Brown, the Defendants paid him millions in "consulting fees," allowed Brown access to its preferred pricing agreement with its vendors, gave him discounts and deferred payment schedules for Brown's payment of scanning fees, and disguised political donations to Brown's political party.

### d.    Foreign Corrupt Practices Act.

128.    Defendants offered, paid, and promised to pay bribes and other things of value to Brown while he was a foreign official within the Bermudian Government, corruptly and for the purpose of influencing official action or decision, inducing an unlawful act, inducing official influence over government action, and securing an improper advantage in order to obtain and retain business.

### e.    Money Laundering.

129.    The Money Laundering Control Act, 18 U.S.C. § 1956, prohibits the use or movement through the United States of proceeds of certain unlawful activity with the intent to promote the unlawful activity.   The Defendants committed money laundering each time they made payment to or received payment from Brown that included sums resulting from their fraudulent scheme.

### 3.    Defendants' racketeering activity formed a pattern.

130.    The racketeering activity listed above constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5) in that the conduct had a central purpose of diverting funds from their intended healthcare purposes to the Defendants.

131.    The pattern of racketeering activity began in or around 1997 and, upon information and belief, continues uninterrupted today.

4. **Defendants' racketeering activity and violations of 18 U.S.C. § 1962(a) directly and proximately caused Plaintiff's injury.**

132.    As a direct and proximate result of Lahey, Brown, and the Brown Clinics' racketeering activities and violations of 18 U.S.C. § 1962(a), Plaintiff has been injured in its business and property and deprived of the honest services of a Government official and healthcare provider to thousands of Bermudians.  Defendants' actions have caused Plaintiff to pay for medically unnecessary diagnostic imaging services, to increase the rate at which it pays for certain health benefits, and to pay for overseas services in the United States tainted by bribes, among other injuries.

133.    By virtue of these violations of 18 U.S.C. § 1962(a), Defendants are jointly and severally liable to Plaintiff for three times the damages Plaintiff sustained, plus the cost of this suit, including reasonable attorneys' fees.

## COUNT II
### RICO SECTION 1962(b)
### (Both Defendants)

134.    The allegations of Paragraphs 1 to 133 are incorporated by reference as if set forth fully herein.

135.    Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(b).

1. **Lahey and/or Lahey, Brown, and the Brown Clinics constitute an enterprise engaged in foreign commerce.**

136.    Lahey and/or the association-in-fact of Lahey, Brown, and the Brown Clinics is an enterprise (the "Enterprise") engaged in and whose activities affect foreign commerce.  The Enterprise had a distinct purpose to enrich Defendants, Brown, and the Brown Clinics and to enhance Defendants' profile and give it a business advantage on Bermuda.  The Enterprise had a

distinct structure honed over nearly two decades and memorialized in several consulting and professional services agreements.

### 2. Lahey acquired and maintained interests in and control of the Enterprise.

137.    Lahey acquired and maintained interests in and control of the Enterprise through a pattern of racketeering activity.  Specifically, by paying Brown bribes to promote its interests in Bermuda, Lahey not only secured for itself the cooperation and influence of a high-ranking official, but Lahey also secured, among other benefits, lucrative contracts with the Brown Clinics and the state-run hospital (KEMH), and preferential access to Bermudians for overseas healthcare services in the United States.

138.    The Defendants played integral roles in the Enterprise and its operations.  Without their participation in the Enterprise's operations, the Enterprise would not have been able to conduct its activity.

139.    The Enterprise's racketeering activities include at least mail and wire fraud (18 U.S.C. §§ 1341, 1343, 1346), violation of the Travel Act (18 U.S.C. § 1952), violation of G.L. c.271 § 39, violation of the Foreign Corrupt Practices Act (15 U.S.C. §§ 78dd-1), and violation of the Money Laundering Control Act (18 U.S.C. § 1956).

### a.    Mail and wire fraud.

140.    The Defendants' scheme necessarily involved multiple violations of the mail and wire fraud statutes, because, as explained above, their scheme to defraud could not have functioned without phones, emails, and wire transfers.

### b.    Travel Act.

141.    The Defendants violated the Travel Act by traveling in foreign commerce and by using facilities of interstate and foreign commerce (including, without limitation, mail, wire, and

e-mail) with the intent to promote, manage, establish, carry on, and facilitate the promotion of unlawful activity, including, but not limited to (1) bribery in violation of the Foreign Corrupt Practices Act (15 U.S.C. §§ 78dd-1) and the Massachusetts Commercial Bribery Statute (G.L. c.271 § 39), and (2) money laundering (18 U.S.C. § 1956).

### c.      G.L. c.271 § 39.

142.    The systematic bribery by the Defendants is a "racketeering activity."  18 U.S.C. s.1961(1) ("racketeering activity" means (A) any act or threat involving … bribery [under state law] ….").  The Defendants' conduct violated Massachusetts's Commercial Bribery Statute.

143.    As bribes to Brown, the Defendants paid him millions in "consulting fees," allowed Brown access to its preferred pricing agreement with its vendors, gave him discounts and deferred payment schedules for Brown's payment of scanning fees, and disguised political donations to Brown's political party.

### d.      Foreign Corrupt Practices Act.

144.    Defendants offered, paid, and promised to pay bribes and other things of value to Brown while he was a foreign official within the Bermudian Government, corruptly and for the purpose of influencing official action or decision, inducing an unlawful act, inducing official influence over government action, and securing an improper advantage in order to obtain and retain business.

### e.      Money Laundering.

145.    The Money Laundering Control Act, 18 U.S.C. § 1956, prohibits the use or movement through the United States of proceeds of certain unlawful activity with the intent to promote the unlawful activity.  The Defendants committed money laundering each time they made payment to or received payment from Brown that included sums resulting from their fraudulent scheme.

### 3.     Defendants' racketeering activity formed a pattern.

146.     The racketeering activity listed above constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5) in that the conduct had a central purpose of diverting funds from their intended healthcare purposes to the Defendants.

147.     The pattern of racketeering activity began in or around 1997 and, upon information and belief, continues uninterrupted today.

### 4.     Defendants' racketeering activity and violations of 18 U.S.C. § 1962(b) directly and proximately caused Plaintiff's injury.

148.     As a direct and proximate result of Lahey, Brown, and the Brown Clinics' racketeering activities and violations of 18 U.S.C. § 1962(b), Plaintiff has been injured in its business and property and deprived of the honest services of a Government official and healthcare provider to thousands of Bermudians.  Defendants' actions have caused Plaintiff to pay for medically unnecessary diagnostic imaging services, to increase the rate at which it pays for certain health benefits, and to pay for overseas services in the United States tainted by bribes, among other injuries.

149.     By virtue of these violations of 18 U.S.C. § 1962(b), Defendants are jointly and severally liable to Plaintiff for three times the damages Plaintiff sustained, plus the cost of this suit, including reasonable attorneys' fees.

### COUNT III
### RICO SECTION 1962(c)
### (Both Defendants)

150.     The allegations of Paragraphs 1 to 149 are incorporated by reference as if set forth fully herein.

151.    Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

**1.    Lahey and/or Lahey, Brown, and the Brown Clinics constitute an enterprise engaged in foreign commerce.**

152.    Lahey and/or the association-in-fact of Lahey, Brown, and the Brown Clinics is an enterprise (the "Enterprise") engaged in and whose activities affect foreign commerce.  The Enterprise had a distinct purpose to enrich Defendants, Brown, and the Brown Clinics and to enhance Defendants' profile and give it a business advantage on Bermuda and in the United States.  The Enterprise had a distinct structure honed over nearly two decades and memorialized in several consulting and professional services agreements.

153.    The Defendants are "persons" distinct from the Enterprise.

**2.    Defendants conducted and participated in the Enterprise through a pattern of racketeering activity.**

154.    The above-described racketeering activities amounted to a common course of conduct intended to deceive and harm Plaintiff.  Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff.  Defendants' racketeering activities are part of their ongoing enterprise and constitute a continuing threat to Plaintiff's business and property.

155.    The Defendants played integral roles in the Enterprise and its operations.  Without Defendants' participation in the Enterprise's operations, the Enterprise would not have been able to conduct its activity.

156.    The Enterprise's racketeering activities include at least mail and wire fraud (18 U.S.C. §§ 1341, 1343, 1346), violation of the Travel Act (18 U.S.C. § 1952), violation of G.L.

c.271 § 39, violation of the Foreign Corrupt Practices Act (15 U.S.C. §§ 78dd-1), and violation of the Money Laundering Control Act (18 U.S.C. § 1956).

### a.      Mail and wire fraud.

157.    The Defendants' scheme necessarily involved multiple violations of the mail and wire fraud statutes, because, as explained above, their scheme to defraud could not have functioned without phones, emails, and wire transfers.

### b.      Travel Act.

158.    The Defendants violated the Travel Act by traveling in foreign commerce and by using facilities of interstate and foreign commerce (including, without limitation, mail, wire, and e-mail) with the intent to promote, manage, establish, carry on, and facilitate the promotion of unlawful activity, including, but not limited to (1) bribery in violation of the Foreign Corrupt Practices Act (15 U.S.C. §§ 78dd-1) and the Massachusetts Commercial Bribery statute (G.L. c.271 § 39), and (2) money laundering (18 U.S.C. § 1956).

### c.      G.L. c.271 § 39.

159.    The systematic bribery by the Defendants is a "racketeering activity."  18 U.S.C. s.1961(1) ("racketeering activity" means (A) any act or threat involving … bribery [under state law] ….").  The Defendants' conduct violated Massachusetts's Commercial Bribery Statute.

160.    As bribes to Brown, the Defendants paid him millions in "consulting fees," allowed Brown access to its preferred pricing agreement with its vendors, gave him discounts and deferred payment schedules for Brown's payment of scanning fees, and disguised political donations to Brown's political party.

### d.      Foreign Corrupt Practices Act.

161.    Defendants offered, paid, and promised to pay bribes and other things of value to Brown while he was a foreign official within the Bermudian Government, corruptly and for the

purpose of influencing official action or decision, inducing an unlawful act, inducing official influence over government action, and securing an improper advantage in order to obtain and retain business.

### e.      Money Laundering.

162.    The Money Laundering Control Act, 18 U.S.C. § 1956, prohibits the use or movement through the United States of proceeds of certain unlawful activity with the intent to promote the unlawful activity.   The Defendants committed money laundering each time they made payment to or received payment from Brown that included sums resulting from their fraudulent scheme.

### 3.      Defendants' racketeering activity formed a pattern.

163.    The racketeering activity listed above constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5) in that the conduct had a central purpose of diverting funds from their intended healthcare purposes to the Defendants.

164.    The pattern of racketeering activity began in or around 1997 and, upon information and belief, continues uninterrupted today.

### 4.      Defendants' racketeering activity and violations of 18 U.S.C. § 1962(c) directly and proximately caused Plaintiff's injury.

165.    As a direct and proximate result of Lahey, Brown, and the Brown Clinics' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff has been injured in its business and property and deprived of the honest services of a Government official and healthcare provider to thousands of Bermudians.   Defendants' actions have caused Plaintiff to pay for medically unnecessary diagnostic imaging services, to increase the rate at which it pays for certain health benefits, and to pay for overseas services in the United States tainted by bribes, among other injuries.

166.     By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are jointly and severally liable to Plaintiff for three times the damages Plaintiff sustained, plus the cost of this suit, including reasonable attorneys' fees.

**COUNT IV**
**RICO SECTION 1962(d) (RICO CONSPIRACY)**
**(Both Defendants)**

167.     The allegations of Paragraphs 1 to 166 are incorporated by reference as if set forth fully herein.

168.     As set forth above, Defendants, along with Brown and the Brown Clinics agreed and conspired to violate 18 U.S.C. §§ 1962(a), (b), and (c), and to directly and indirectly use or invest income that is derived from a pattern of racketeering activity in an enterprise, acquire or maintain interests in the enterprise through a pattern of racketeering activity, and conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the section 1962(a), (b), and (c) enterprises described above through a pattern of racketeering activity.

169.     Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.  That conduct constitutes a conspiracy to violate 18 U.S.C. §§ 1962(a), (b), and (c), in violation of 18 U.S.C. §1962(d).

170.     As demonstrated in detail above, Defendants, along with Brown and the Brown Clinics, have engaged in numerous overt and predicate racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions design to defraud Plaintiff of money, property, and honest services.

171.    The nature of the above-described acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. §§ 1962(a), (b), and (c), but they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

172.    As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. §§ 1962(a), (b), and (c), Plaintiff has been and is continuing to be injured in its business or property and deprived of the honest services of a Government official and healthcare provider to thousands of Bermudians.  Defendants' actions have caused Plaintiff to pay for medically unnecessary diagnostic imaging services, increase the rate at it which pays for certain health benefits, and to pay for overseas services in the United States tainted by bribes, among other injuries.

173.    By virtue of these violations of 18 U.S.C. § 1962(d), Defendants are jointly and severally liable to Plaintiff for three times the damages Plaintiff sustained, plus the cost of this suit, including reasonable attorneys' fees.

## COUNT V
## UNFAIR BUSINESS PRACTICES, M.G.L. C.93A § 11
### (Both Defendants)

174.    The allegations of Paragraphs 1 to 173 are incorporated by reference as if set forth fully herein.

175.    Bermuda and Lahey are persons and engage in trade and commerce within the meaning of G.L. c. 93A, §1.

176.    As set forth in detail herein, conduct in violation of G.L. c. 93A occurred primarily and substantially in Massachusetts.

177.     Lahey's conduct constitutes willful and knowing violations of G.L. c. 93A, §§ 2 and 11.

178.     As a result of Lahey's violations of G.L. 93A, §§ 2 and 11, Plaintiff has suffered monetary damages and has suffered substantial and irreparable injury and is threatened with further substantial and irreparable harm, for which there is no adequate remedy at law to compensate Plaintiff.

**COUNT VI**
**UNJUST ENRICHMENT**
**(Both Defendants)**

179.     The allegations of Paragraphs 1 to 178 are incorporated by reference as if set forth fully herein.

180.     Defendants have acquired money and other benefits from Bermuda that they otherwise would not have acquired but for their wrongful acts and practices, which benefits belongs to Bermuda and which have been retained by Defendants through their wrongful acts and practices.

181.     Defendants unjustly gained benefits from Bermuda as a direct result of their wrongful conduct.

182.     Defendants appreciate and have knowledge of said benefits.

183.     Under principles of equity and good conscience, Defendants should not be permitted to retain the benefits they acquired through their unlawful conduct.   All funds, revenues, and benefits received by them rightfully belong to Bermuda and should be returned to Bermuda in an amount to be determined at trial.

## COUNT VII
## CIVIL CONSPIRACY
### (Both Defendants)

184.     The allegations of Paragraphs 1 to 183 are incorporated by reference as if set forth fully herein.

185.     Defendants, along with Brown and the Brown Clinics, agreed and conspired with each other and others to perpetrate a common plan to defraud Plaintiff by knowingly making or causing to be made reports, statements and claims that were false or fraudulent as a result of being the product or inducement or a bribe or facilitating a request for payment for medically unnecessary services, including, but not limited to, diagnostic testing.

186.     The conspiracy of the Defendants, Brown, and the Brown Clinics commenced as early as 1997 and continues through the present.

187.     Defendants knew that their plan or scheme would result in, or would have a high likelihood of resulting in, damage to the Plaintiff.

188.     Defendants, along with Brown and the Brown Clinics, took affirmative steps to execute their scheme or scheme through a series of overt acts, including, but not limited to, concealing the true nature of their illegal relationship from public authorities, submitting false or fraudulent claims for payment or approval, and inducing physicians to increase referrals to the Brown Clinics for the purpose of increasing the number of unnecessary scans performed and seeking reimbursement for those scans.

189.     As a result of Defendants' conduct and overt acts in furtherance of the scheme, Plaintiff sustained damages in an amount to be determined at trial.

**COUNT VIII**
**FRAUD**
**(Both Defendants)**

190.    The allegations of Paragraphs 1 to 189 are incorporated by reference as if set forth fully herein.

191.    Lahey, both directly and through Brown and his Clinics, knowingly made or caused to be made reports, statements and claims for services that were impliedly or expressly represented to be medically necessary, which reports, statements and claims were false or fraudulent, insofar as they were the product of inducement or a bribe and/or not medically necessary.

192.    Bermuda relied on the claims as true to its detriment and sustained damages in an amount to be determined at trial.

**PRAYERS FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, as follows:

a.    On Plaintiff's First through Fourth Claims for Relief, three times the damages Plaintiff has sustained as a result of Defendants' conduct, plus Plaintiff's costs in this suit, including reasonable attorneys' fees.

b.    On Plaintiff's Fifth Claim for Relief, three times the damages Plaintiff has sustained as a result of Defendants' conduct, plus Plaintiff's costs in this suit, including reasonable attorneys' fees.

c.    On Plaintiff's Sixth through Eighth Claims for Relief, an award to Plaintiff and disgorgement of all sums improperly received by Defendants, plus costs of this suit, and reasonable attorneys' fees and expenses;

d.    An award of prejudgment interest in the maximum amount allowable by law;

e.   An award to Plaintiff of its costs and expenses in this litigation and reasonable

attorneys' and expert fees and expenses; and

f.   An award to Plaintiff of such other and further relief as may be just and proper

under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury as to all claims that may be tried to a jury.

Respectfully submitted,

GOVERNMENT OF BERMUDA


/s/ *Luke T. Cadigan*
Luke T. Cadigan (BBO #561117)
Robert B. Lovett (BBO #561691)
Michael J. McMahon (BBO # 679053)
Elizabeth A. Trafton (BBO #693969)
COOLEY LLP
500 Boylston Street
Boston, MA  02116-3736
Tel.:  (617) 937-2300
Fax:   (617) 937-2400
lcadigan@cooley.com
rlovett@cooley.com
mmcmahon@cooley.com
etrafton@cooley.com

*Counsel for Plaintiff Government of Bermuda*

Dated: February 14, 2017