UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| GOVERNMENT OF BERMUDA, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 17-cv-10242-IT |
| | * | |
| LAHEY CLINIC, INC., et al., | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM AND ORDER

March 8, 2018

TALWANI, D.J.

The Government of Bermuda ("Bermuda") brings a federal claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., and state claims under Massachusetts General Laws c. 93A, § 11, and common law theories of conspiracy, fraud, and unjust enrichment against Defendants Lahey Clinic, Inc., and Lahey Clinic Hospital, Inc. (collectively, "Lahey"). Before the court is Lahey's Motion to Dismiss the Plaintiff's Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b) [#16]. For the reasons set forth below, Lahey's motion is ALLOWED.

**I. Standard of Review**

A motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss a complaint for failure to state a claim upon which relief can be granted is properly allowed when the complaint does not contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 554, 570 (2007)). Considering the complaint in the light most favorable to the plaintiff, see Germanowski v. Harris, 854 F.3d 68, 71 (1st Cir. 2017), the

court will "determine whether the factual allegations are sufficient to support the reasonable inference that the defendant is liable." Saldivar v. Racine, 818 F.3d 14, 18 (1st Cir. 2016) (quoting Cardigan Mtn. Sch. v. N.H. Ins. Co., 787 F.3d 82, 84 (1st Cir. 2015)).

## II. Allegations in the Complaint

This case involves an alleged conspiracy between Lahey and Dr. Ewart Brown ("Brown"). Brown is the former Premier of Bermuda, a longstanding Member of Bermuda's Parliament, and the owner of two private health clinics in Bermuda. Compl. ¶ 8 [#1]. Bermuda alleges that Lahey paid Brown bribes disguised as "consulting fees," gave him discounts on medical equipment and services, and made political donations to his campaign, in return for which Brown ensured Lahey: 1) "made millions of dollars reading and interpreting medically unnecessary MRI and CT scans performed at Brown's clinics"; 2) "received preferential treatment when bidding on healthcare contracts issued by the Bermudian Government"; and 3) "obtained privileged access to Bermudian patients that it could service at its facilities in Massachusetts and in Bermuda." Id. ¶ 1; see also ¶¶ 9, 31, 45. The Complaint describes these three distinct schemes are as follows.

### *A. Scanning Scheme*

In the "scanning scheme," Lahey and Brown allegedly conspired to conduct medically unnecessary scans at Brown's two on-island clinics (the "Brown Clinics") for profit. Pursuant to exclusive contracts between Lahey and the Brown Clinics, Lahey interpreted imaging results forwarded electronically from the Brown Clinics in Bermuda to Lahey in Massachusetts and sent electronic reports back to the Brown Clinics for a fee. Compl. ¶¶ 70-71. Brown allegedly paid this fee out of the money he received from insurers after submitting claims for reimbursement. Id. ¶ 70. Lahey also assisted with certain scans performed at the Brown Clinics from its campus

2

in Massachusetts "by giving specific instructions on how to carry out the scan including where the patient should be positioned." Id. ¶ 82. Brown allegedly induced patient referrals for diagnostic scanning at the Brown Clinics "by offering paid kickbacks, which he dubbed 'commissions,' ranging from between 5% to 17.5% of reimbursements to local physicians." Id. ¶ 92.

As a direct result of this scheme, the Brown Clinics allegedly conducted and Lahey interpreted "thousands of medically unnecessary tests" at Bermuda's expense. Id. ¶ 70. Bermuda paid Brown for these tests when he submitted claims for reimbursement to Bermuda public insurers; Brown in turn paid Lahey's fees. Id.[1] Bermuda alleges Lahey "must have known" these tests were unnecessary "for several years," due to the fact that Bermuda was conducting scans "at a rate disproportionate to like nations." Id. ¶ 81.

The Complaint alleges a secondary effect of the scanning scheme, namely that "MRI and CT scanning on the island increased exponentially," causing Bermudian insurance rates to increase. Id. ¶ 70. In Bermuda, insurers are required to provide each insured a minimum package of medical benefits called Standard Health Benefits. Id. ¶ 83. The government subsidizes payment of Standard Health Benefit "claims" for certain Bermudians. Id. ¶ 84. Each year, the Ministry of Health, Seniors and Environment determines a Standard Premium Rate for the Standard Health Benefits based on the claims experience of all insured participants. Id. ¶ 85. The Complaint alleges that "[i]n part as a result of [the scanning scheme] . . . the Standard Premium Rate for the Standard Health Benefits package provided to each Bermudian citizen more than

---

[1] The Complaint further alleges that Brown "pushed for deep discounts" on the scanning services, which "Lahey willingly granted," enabling him to keep a larger portion of the reimbursement he received from the Bermudian Government. Compl. ¶ 73. Lahey also allegedly provided Brown with significant extensions on overdue bills. Id. ¶ 74.

3

doubled between Fiscal Year 2007 ($140.92) and Fiscal Year 2016 ($338.07)." Id. ¶ 86. Insured Bermudians paid higher premiums, and Bermuda provided higher subsidies. Id. ¶ 85. Brown allegedly influenced this increase further by "constantly appl[ying] pressure to government officials to increase remuneration for tests undertaken by the Brown Clinics and read by Lahey, notwithstanding their already high price tag." Id. ¶ 90.

### B. Bidding Scheme

In the second alleged scheme, Lahey secured several lucrative subcontracts over other healthcare service providers as a result of its relationship with Brown. The Complaint describes subcontracts for two specific projects.

The first project was a $13.5 million, five-year contract to develop a long-term healthcare strategy for the island and "revamp" Bermuda's state-run hospital, King Edward Memorial Hospital ("KEMH"). Brown allegedly "used his role as Premier" to facilitate a meeting between Lahey and the Bermuda Minister of Health to discuss Lahey's involvement in the "new" hospital. Compl. ¶ 50. Brown then secured the KEMH contract for a U.S.-based healthcare management and consulting company known as Kurron Shares of America, Inc. ("Kurron America"). Brown allegedly controlled Kurron America through his relationship with its owner, a former business associate, and used this control to facilitate a subcontract on the project with Lahey. Id.[2]

The second project involved an annual $1.3 million contract with a separate company, Kurron Bermuda, to develop "FutureCare," a Bermudian public insurance plan for citizens over 65. Id. ¶ 59. Brown allegedly used his "influence and connections to ensure that Lahey was

---

[2] Bermuda allegedly terminated its contract with Kurron America in 2011 because it was "mired in scandal due to high payments to health consultants." Id. ¶ 52.

4

favored over other potential U.S. healthcare providers, including Johns Hopkins, for lucrative contracts relating to 'FutureCare.'" Id.[3]

### C. Preferred Provider Scheme

In the third scheme, Bermuda public insurers made Lahey a "preferred provider" of medically necessary services not available in Bermuda, allegedly due to "Lahey's continued payments to and exploitation of Brown." Compl. ¶ 63. Lahey is one medical service provider in a "network" of preferred providers. Id. ¶ 64. As a result, Lahey treats "[h]undreds of Bermudians" who travel to Lahey in Massachusetts each year for treatment, id., and it also "services Bermudians remotely from its campus in Massachusetts," id. ¶ 66. Bermuda's Health Insurance Plan, a basic government-funded health plan for persons of all ages, paid 60% of usual and customary charges for medically necessary services by in-network providers such as Lahey, and 50% for out-of-network providers. Id. ¶ 64. FutureCare paid 75% of these services for in-network providers, and 65% for out-of-network providers. Id. Bermuda alleges that between 2010 and 2016, Bermuda's Health Insurance Plan and FutureCare paid Lahey over $10 million for services Lahey performed at its facilities in Massachusetts as a preferred provider, id. ¶ 59, and the Bermudian Government Employees Health Insurance paid Lahey over $29 million for such services, id. ¶ 79. Payments for Lahey's Massachusetts services, "once approved," were allegedly made "from and/or through Bermuda's bank accounts, or those of its agents, in the United States." Id. ¶ 65.

---

[3] In several instances, the Complaint refers more generally to "contracts" Lahey obtained as a result of the alleged conspiracy. See, e.g., Compl. ¶ 2 ("Brown . . . directed lucrative healthcare contracts to Lahey); id. ¶ 50 ("Lahey continued to be involved in the planning and development of the Urgent Care Center on Bermuda's East End *as well as additional contracts for the hospital*") (emphasis added); id. ¶ 109 ("Bermuda also worked with Lahey on contracts that Lahey received from the Government."). The Complaint includes no details of any such contracts except as they relate to the bidding or preferred provider schemes described herein.

5

**III. Discussion**

RICO prohibits racketeering activity, which the statute defines to encompass "dozens of state and federal offenses, known in RICO parlance as predicates." RJR Nabisco, Inc. v. European Cmty., 136 S.Ct. 2090, 2096 (2016). "Violations of § 1962 are subject to criminal penalties, § 1963(a), and civil proceedings to enforce those prohibitions may be brought by the Attorney General, §§ 1964(a)-(b)." Id. at 2097. Bermuda alleges several predicate offenses in violation of 18 U.S.C. §§1962(a), (b), and (c), stating that "in order to promote Lahey's interests in Bermuda, and pursuant to written 'consultancy agreements,' Lahey bribed Brown with ever-increasing consulting fees in violation of the Foreign Corrupt Practices Act (15 U.S.C. §§ 78dd-1, et seq.), the Travel Act (18 U.S. Code § 1952), the Money Laundering Control Act (18 U.S.C. § 1956), the Massachusetts Commercial Bribery Statute (G.L. c.271 § 39), and mail and wire fraud statutes (18 U.S.C. §§ 1341, 1343, 1346)." Compl. ¶ 113(a). According to Bermuda, Lahey knew these predicate acts were part of racketeering activity and willingly engaged in a conspiracy in violation of 18 U.S.C. § 1962(d). See id. ¶ 169.

In addition to providing for criminal or civil prosecution by the United States government for racketeering activity, RICO creates a private right of action for "[a]ny person injured in his business or property by reason of a violation" of those prohibitions listed in § 1962. See 18 U.S.C. § 1964(c); RJR Nabisco, 136 S.Ct. at 2097. A private RICO "plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the [RICO] violation." Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985).

In RJR Nabisco, the Supreme Court considered whether RICO's private right of action applies extraterritorially. The Court found that this issue involved two questions: first, whether

6

RICO's substantive provisions apply to conduct occurring outside the United States, and second, whether RICO's private right of action affords relief for conduct occurring outside the United States. In considering these two questions, the Court began with the presumption against extraterritoriality. This presumption holds that absent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application. See Morrison v. Nat'l Australia Bank Ltd., 561 U.S. 247, 280 (2010). The Court found that Congress's incorporation of RICO predicates which plainly apply to at least some foreign conduct provided a "clear, affirmative indication that § 1962 applies to foreign racketeering activity . . . to the extent that the predicates alleged in a particular case themselves apply extraterritorially." RJR Nabisco, 136 S.Ct. at 2101-02. As to the second question, the Court reasoned that "the creation of a private right of action raises issues beyond the mere consideration whether underlying primary conduct should be allowed or not." Id. at 2106. It thus applied the presumption against extraterritoriality separately to RICO's private right of action and found that "[n]othing in § 1964(c) provides a clear indication that Congress intended to create a private right of action for injuries suffered outside of the United States." 146 S.Ct. at 2108. From this the Supreme Court concluded that "Section 1964(c) requires a civil RICO plaintiff to allege and prove a *domestic injury* to business or property and does not allow recovery for foreign injuries." Id. at 2110 (emphasis added).

According to RJR Nabisco, if a statute is not extraterritorial, courts must determine whether an individual case involves a domestic application of the statute in question by looking to the statute's "focus." 136 S.Ct. at 2101. "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country,

7

then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." Id. Two cases cited by Plaintiff suggest that there is a permissible domestic application of § 1964(c) if a RICO defendant's predicate acts occurred in the United States. See Tatung Co., Ltd. v. Shu Tze Hsu, 217 F. Supp. 3d 1138, 1155 (C.D. Cal. 2016) (finding foreign corporation suffered a domestic injury when it was harmed "in the course of doing business" in the United States); Akishev v. Kapustin, No. CV 13-7152(NLH) (AMD), 2016 WL 7165714 (D.N.J. Dec. 8, 2016) (finding domestic injury when foreign plaintiffs "traveled" to the United States via the internet and purchased cars falsely advertised on a U.S.-based website that were never delivered or were otherwise misrepresented). "Other courts have considered the 'domestic injury' question under varying circumstances, but most of them did not focus on where the RICO predicate acts occurred; rather, most of the courts appear to have focused on where plaintiffs' injuries were felt." Cevdet Aksut Ogullari Koll. Sti v. Cavusoglu, 245 F. Supp. 3d 650, 657 (D.N.J. 2017). In RJR Nabisco, the majority rejected the dissent's assertion "that a RICO plaintiff may sue for foreign injury that was caused by the violation of a predicate statute that applies extraterritorially," stating that such an approach "fails to appreciate that the presumption against extraterritoriality must be applied separately to both RICO's substantive prohibitions and its private right of action." 136 S. Ct. at 2108. Treating RICO's provisions separately leads to the conclusion that "the 'focus' of § 1964(c) is the injury suffered and not the predicate acts that caused the injury." Cevdet, 245 F. Supp. 3d at 657.

The question presented in this case is whether Bermuda may bring an action for the various injuries alleged under RICO's private right of action. It may well be that Bermuda's allegations as to Lahey's commission of various predicate acts would suffice for criminal charges under § 1963(a) or civil enforcement proceedings brought by the Attorney General under

8

§ 1964(a)-(b); however, the focus of this motion is whether Bermuda, as a private party, may bring these charges under § 1964(c). That depends on whether Bermuda has alleged domestic injuries to business or property caused by Lahey's conduct. The injuries in this case are assessed in turn.

### A. *Scanning Scheme*

Bermuda asserts that, as a result of Lahey's relationship with Brown, it paid "millions of dollars for thousands of medically unnecessary diagnostic imaging tests read by Lahey in the United States." See Compl. ¶¶ 69, 70, 77, 94, 113. It further alleges that "Defendants' actions had the direct and proximate effect of increasing the premiums for [standard Bermudian health] benefits, and causing Bermuda to pay . . . increased healthcare costs." Id. ¶ 113(b).

Bermuda has not alleged that it suffered an injury to its U.S.-held business or property. First, the Complaint alleges that payment for scans reviewed by Lahey were made by the Brown Clinics out of their own accounts. Id. ¶ 70. These alleged facts are analogous to a scheme found by the Second Circuit to fail the domestic injury requirement. There, as here, the "relevant property always remained abroad, and these injuries did not arise from any preexisting connection between [the plaintiff] and the United States." Bascuñán v. Elsaca, 874 F.3d 806, 819 (2d Cir. 2017). The relevant transaction in this case allegedly resulted in unnecessary payments *in Bermuda.* This alleged scheme did not cause injury to U.S. business or property.

Bermuda alleges further that "Brown constantly applied pressure to government officials to increase remuneration for tests undertaken by the Brown Clinics and read by Lahey." Compl. ¶ 90. Nowhere does the complaint allege that these payments were made from bank accounts located in the United States. In Bascuñán, the Second Circuit held that money is "tangible property" which satisfies RJR Nabisco's domestic injury requirement "if plaintiff's property was

9

located in the United States when it was stolen or harmed, even if the plaintiff himself resides abroad." 874 F.3d at 820-21. There, the court found the original geographic location of misappropriated funds to be dispositive: "[A] defendant's use of the U.S. financial system to conceal or effectuate his tort does not, on its own, turn an otherwise foreign injury into a domestic one." Id. at 819. Bascuñán's well-reasoned logic shows that there is no domestic injury here, where the Complaint does not allege misappropriation of domestic funds.

The other alleged injury from the scanning scheme, the increase in the Standard Premium Rate for Bermudian public insurance, also fails to satisfy the domestic injury requirement. The complaint alleges that, as a result of the increased scanning and vociferous lobbying by Brown, the Bermudian Ministry of Health, Seniors and Environment increased the Standard Premium Rate for public insurance, which in turn, "ha[d] an impact on the costs of premiums paid by the insured population and the level of subsidies provided by the Government." Compl. ¶¶ 85-86. Bermuda does not allege that the Standard Health Benefits or Standard Premium Rate applied to reimbursements outside Bermuda. Since Bermuda does not allege the insurance reimbursements for scans conducted in Bermuda were paid from U.S.-based bank accounts, Bermuda does not state a specific injury to its U.S. business or property.[4]

Bermuda has not shown that it suffered any injuries in the United States as a result of the alleged scanning scheme. Without such an injury, Bermuda's RICO claims as to the scanning scheme arise out of extraterritorial injuries and must be DISMISSED.

---

[4] Bermuda also alleges that the scanning scheme created physiological and psychological risks for patients being "overscanned." Compl. ¶ 101. Assuming Bermuda would have standing to assert such injuries, they occurred in Bermuda where the scans were performed, and are furthermore not the type of injury "to business or property" required by the RICO statute. See 18 U.S.C. § 1964(c); see also Van Schaick v. Church of Scientology of Cal., Inc., 535 F. Supp. 1125, 1137 (D. Mass. 1982) (dismissing a RICO claim alleging emotional distress).

10

### B. Bidding Scheme

Bermuda also alleges that as a result of its relationship with Lahey, "Brown ensured that Lahey received preferential treatment when bidding (and, indeed, even when not bidding) on healthcare contracts," and that, as a result, it was "the victim of a corrupt bidding process[]." Compl. ¶ 113(a). The Complaint only specifically describes how Brown secured subcontracts for Lahey as to two projects: one with Kurron America, and one with Kurron Bermuda. See id. ¶¶ 51-59. Even assuming Lahey's participation in these subcontracts inflicted the type of "competitive injury" prohibited by RICO's substantive provisions,[5] Bermuda's bidding scheme claims are also barred by the presumption against extraterritoriality.

The projects in question both involved Bermuda-based work whose effects were felt in Bermuda. Cf. Elsevier Inc. v. Pierre Grossmann, IBIS Corp., No. 12 CIV. 5121 (KPF), 2017 WL 5135992, at *4 (S.D.N.Y. Nov. 2, 2017) (discussing how the domestic injury inquiry "focus[es] on where the plaintiff felt the effects of the injury rather than where the defendant committed the injury-inducing acts").[6] The complaint does not allege that payments for the Kurron America

---

[5] "Competitive injury," as alleged here, could theoretically constitute an "intangible injury" to business, rather than a tangible injury to property in the form of money. Though not dispositive in this case, the Second Circuit suggested that residency may be relevant to the domestic injury inquiry. See Bascuñán, 874 F.3d at 824 ("[W]e do not hold that a plaintiff's place of residence is never relevant to the domestic injury inquiry . . . A plaintiff's residence may often be relevant – perhaps even dispositive—in determining whether certain types of business or property injuries constitute a domestic injury."); see also id. at 823 (suggesting that for the "diminished value of ownership in a company . . . the clear locational nexus was the shareholder's place of residence").

[6] Presumably as an extension of this work, Bermuda alleges that Brown established a partnership between KEMH and Lahey "wherein Lahey physicians would travel to Bermuda from Massachusetts and see patients at the *state-run hospital*." Id. ¶ 58 (emphasis added). Brown also secured Lahey "a prestigious appointment . . . as a Clinical Advisor for KEMH's General Surgery and Outpatient Care services." Id. ¶ 61. To the extent these acts constitute an injury to Bermuda, they were both based in Bermuda and thus fail to satisfy the domestic injury requirement.

11

project or any other KEMH-related work were made from Bermuda's U.S.-based bank accounts or, in fact, paid by Bermuda at all. This is not sufficient to satisfy RICO's domestic injury requirement. See, e.g., Newman v. Jewish Agency for Israel, No. 16-CV-7593, 2017 WL 6628616, at *4 (S.D.N.Y. Dec. 28, 2017) (dismissing a RICO claim under the domestic injury requirement for alleging deprivation of funds without offering specific allegations concerning where the accounts were located or used).

The Kurron Bermuda project involved developing the "FutureCare" public insurance plan. Bermuda alleges that "Brown used his influence and connections to ensure that Lahey was favored over other potential U.S. healthcare providers, including Johns Hopkins, for lucrative contracts relating to 'FutureCare.'" Id. ¶ 59. As FutureCare is a Bermudian public insurer which reimburses healthcare costs of Bermudian residents, the court cannot, without more, find any injury from these contracts to business or property in the United States. While entities like Johns Hopkins, whose domestic profits were competitively injured by such contracts, might have a valid domestic injury claim, Bermuda does not. Cf. Elsevier, Inc. v. Grossman, 199 F. Supp. 3d 768, 789 (S.D.N.Y. 2016) (considering whether racketeering activity "had some effect on Plaintiffs' relationships with actual or prospective U.S. customers").

Bermuda has not shown that it suffered any domestic injuries as a result of the alleged bidding scheme. Without such an injury, Bermuda's RICO claims as to the bidding scheme must be DISMISSED.

### C. Preferred Provider Scheme

Bermuda finally alleges that, as a product of the preferred provider scheme, it sustained "injury to property in the United States resulting from Bermuda's payment of tens of millions of dollars from and through bank accounts in the United States to Lahey, in the United States, for

12

services that Lahey corruptly obtained and carried out in the United States." Compl. ¶¶ 107, 113.[7] Since Bermuda alleges payment for these services was made "from and/or through Bermuda's bank accounts, or those of its agents, in the United States," id. ¶ 65,[8] the domestic aspect of the injury requirement is met as to these services.

Bermuda faces a different standing problem, however, as to this scheme. Bermuda claims that it was injured by paying for "overseas services in the United States tainted by bribes." Id. ¶ 132. Bermuda's allegations boil down to the following assertion: because Lahey potentially obtained a greater opportunity to service Bermudian residents by becoming a preferred provider through bribery, paying Lahey for even medically *necessary* services is inherently injurious to Bermuda. Such injury is insufficient to establish standing under RICO.

"[T]he requirement of injury in one's 'business or property' limits the availability of RICO's civil remedies to those who have suffered injury in fact." Holmes v. Sec. Inv'r Prot. Corp., 503 U.S. 258, 279 (1992). This means that to have standing, it must be the case that a plaintiff's injury "fairly can be traced to the challenged action and is likely to be redressed by a favorable decision." Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 472 (1982) (internal quotations omitted). Civil RICO injuries are further limited by statute: "All civil RICO injuries are, by the terms of the statute itself, *economic*

---

[7] As previously discussed, the distinction between sending money "from" or "through" a bank account is material to the domestic injury analysis. See Bascuñán, 874 F.3d at 819 (rejecting the argument that mere "use of bank accounts located within the United States" creates domestic injury because "[t]o hold otherwise would subvert the intended effect of the 'domestic injury' requirement articulated by the RJR Nabisco Court").

[8] The court assumes, without deciding, that payment through a domestic agent is analogous to domestic payment by a principal. See, e.g., Elsevier, 2017 WL 5135992, at *2 (substituting the actions of domestic employees for the actions of their foreign employer for purposes of the domestic injury analysis).

13

losses of one kind or another. A plaintiff bringing a civil RICO claim . . . cannot, for example, recover for 'personal injuries.'" Bascuñán, 874 F.3d at 817 (emphasis added). Furthermore, any "recoverable damages" under § 1962(c) must "flow from the commission of the predicate acts." Sedima, 473 U.S. at 497.

Although at the pleading stage of a RICO case, "general factual allegations of injury resulting from the defendant's conduct may suffice," Bermuda fails to meet this basic showing that the preferred provider scheme led to an economic injury. See Nat'l Org. for Women, Inc. v. Scheidler, 510 U.S. 249, 256 (1994). As a preferred provider, Lahey provided "medically necessary services not available in Bermuda" to Bermudians traveling abroad. Compl. ¶ 64. Bermuda does not allege that Bermuda paid more for Lahey's services than it would have with another provider, that Bermudian patients received lower-quality services, or that Bermuda paid for any services for which it would not have paid otherwise. Bermuda's own involvement in the claims adjudication process further illustrates that Lahey's provision of these services did not injure Bermuda economically. Bermuda "negotiate[d] agreements for covered services and established rates with overseas providers," and each claim for services was adjudicated "pursuant to policies set by the Bermudian Government" by Bermuda's claims processing agents who "specialize in cost containment." Id. ¶ 65. While this case might be different if brought by a plaintiff who could allege competitive injury as a result of this scheme, such as by Lahey's U.S. competitors, Bermuda simply does not allege that it suffered costs it would not have otherwise incurred.[9]

---

[9] Bermuda generally alleges that Lahey and Brown's scheme led to "the receipt of dishonest services from an elected government official or Lahey itself." Compl. ¶ 113(a). The dishonest services statute is a criminal proscription of "fraudulent schemes to deprive another of honest services through bribes or kickbacks supplied by a third party who [has] not been deceived." Skilling v. United States, 561 U.S. 358, 404 (2010). While the statute may serve as a predicate

14

Thus, Bermuda does not have standing, because it has not shown that it suffered any injury to business or property as a result of the alleged preferred provider scheme. As a result, Bermuda's RICO claims as to the preferred provider scheme must be DISMISSED.

**IV. State Law Claims**

Bermuda also brings claims under Massachusetts General Laws c. 93A, § 11 (for unfair business practices) and common law claims under theories of unjust enrichment, civil conspiracy, and fraud. "[W]hen all federal claims have been dismissed, it is an abuse of discretion for a district court to retain jurisdiction over the remaining pendent state law claims unless doing so would serve 'the interests of fairness, judicial economy, convenience, and comity.'" See Wilbur v. Curtis, 872 F.3d 15, 23 (1st Cir. 2017); see also Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 355 (1988) ("When the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice."). Given the early stage of this litigation and the fact that the parties have not yet begun the arduous task of discovery, retaining jurisdiction over Bermuda's pendent state law claims would not serve such interests. Accordingly, Bermuda's state-law claims are DISMISSED without prejudice.

---

offense to a civil RICO action, it fails to satisfy the economic injury requirement of § 1964(c) on its face. See 18 U.S.C. § 1346 ("the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the *intangible right* of honest services.") (emphasis added). A claim that dishonest services fraud resulted in an inherent loss of competitive business opportunities does not satisfy the pleading obligations under RICO. See, e.g., World Wrestling Entm't, Inc. v. Jakks Pac., Inc., 530 F. Supp. 2d 486, 520 (S.D.N.Y. 2007), aff'd, 328 F. App'x 695 (2d Cir. 2009) (dismissing a RICO claim premised on dishonest services for lack of economic injury when there was no "proof as to what a non-corrupt business process would have yielded"). Thus, alleging the receipt of dishonest medical services, without alleging specific economic injury resulting from such services, does not save Bermuda's claim.

## V. Conclusion

For the foregoing reasons, Lahey's Motion to Dismiss [#16] is ALLOWED.

IT IS SO ORDERED.

March 8, 2018 /s/ Indira Talwani
United States District Judge